**1420**

Janis DUNN; William Dunn; Anthony Amorose; Stella Badia; Samuel W. Brown and Evelyn Brown, his wife; Debra Burgess; Louis Kenneth Davis, Sr. and Helen H. Davis, his wife; Frank J. DeLost and Marie K. DeLost, his wife; Tony DeLost and Jean B. DeLost, his wife; Robert E. Dunn and Dorothy C. Dunn, his wife; Robert W. Dunn and Kathryn Dunn, his wife; Audrey Farson; Jane B. Heirendt; M. Marjorie Herron; John R. Hilderbrand, Sr.; Edward T. Liptak and Jacqueline Liptak, his wife; Jacqueline Liptak, as custodian for Edward Liptak; Donna G. Mack; Elizabeth Maffio; Patricia Malardie; Edward J. Marton and Juanita Marton, his wife; Est Betty McGant, Through Exec. Alexander McGant; Barbara L. Prowitt; Elio Spinosa and Isabella M. Spinosa, his wife; Michael Tomecsko and Peggy Tomecsko, his wife; Gerald H. Wagner and Rosann Wagner, his wife; Sophie Winseck; Elmer J. Young, Sr.; and Frank R. Zuzek, Appellees,

v.

The UNITED STATES of America; United States Department of Energy and the Honorable James B. Edwards, its Secretary; United States Department of Defense and The Honorable Frank Carlucci, its Secretary; United States Nuclear Regulatory Commission and Joseph M. Hendrie, its Chairman; United States Department of Public Health & Welfare and The Honorable Otis R. Bowen, its Secretary; United States Environmental Protection Agency and Lee M. Thomas, its Administrator; the Commonwealth of Pennsylvania and The Honorable Robert P. Casey, its Governor; and the Pennsylvania Department of Environmental Resources and Arthur A. Davis, its Secretary, Appellants.

No. 86–3763.

United States Court of Appeals, Third Circuit.

Argued July 14, 1987.

Decided March 23, 1988.

Jon Hogue (argued), J. Jerome Mansmann, Robert J. Cindrich, Paul H. Titus, Mansmann Cindrich & Titus, Pittsburgh, Pa., for appellees.

F. Henry Habicht II, Asst. Atty. Gen., David W. Zugschwerdt, Martin W. Matzen, Sarah P. Robinson (argued), Dept. of Justice, Land and Natural Resources Div., Appellate Section, Washington, D.C., J. Alan Johnson, U.S. Atty., Paul J. Brysch, Asst. U.S. Atty., Pittsburgh, Pa., for appellants.

Before HIGGINBOTHAM, BECKER and HUNTER, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal by the United States arises from an award by the district court of $144,590.65 in attorneys' fees and expenses to plaintiff's counsel under the Equal Access to Justice Act, as amended, 28 U.S.C. § 2412(d)(1)(A) (1982 & Supp. III 1985) ("EAJA").[1] In the civil action underlying the fee award, thirty-nine individuals (the "Dunn Group") living or doing business in the vicinity of an inactive uranium ore processing mill in Canonsburg, Pennsylvania (the "Site") sued the United States, the Commonwealth of Pennsylvania, and numerous federal and state agencies and officials in the District Court for the Western District of Pennsylvania, seeking declaratory and injunctive relief with respect to the need for cleanup of radioactive materials at the Site. The suit was predicated upon the defendants' alleged failure both to comply with federal environmental laws and to abate the public nuisance at the Site. This phase of the litigation ended with the entry of a consent judgment, in which the federal defendants agreed, *inter alia*, that the United States Department of Energy ("DOE") would hold informational public meetings before the commencement of each construction season for remedial action at the Site.[2] Thereafter, the district court ultimately awarded counsel for the Dunn Group fees and costs in the abovementioned amount, having enhanced the lodestar by a multiplier of 1.5 in recognition of the contingent nature of success and the quality of counsel's work on the case.[3]

1. Plaintiffs retained counsel on a contingent fee basis and made no payments to counsel for fees and expenses. The district court awarded fees and expenses directly to plaintiffs' counsel.

2. At the time of entry of the consent judgment, the district court dismissed the action with prejudice as to the state defendants.

3. The Dunn Group filed a petition for attorneys' fees and expenses under EAJA on June 22, 1984, the thirtieth day after entry of the consent judgment. EAJA requires that the party seeking an award of fees and expenses submit the application for such fees "within thirty days of final judgment in the action." 28 U.S.C. § 2412(d)(1)(B). An EAJA application must show that the party is a prevailing party, is

In its appeal of the fee award, the Government contends that the district court erred in concluding that the members of the Dunn Group were prevailing parties under EAJA. The Government also challenges the district court's conclusion that the position of the United States was not "substantially justified" within the meaning of EAJA and its award of quality and contingency multipliers. For the reasons that follow, we conclude that, on the present record, the district court's determination that plaintiffs were prevailing parties for purposes of an EAJA fee award was clearly erroneous. Therefore, we will vacate the judgment of the district court but, because the prevailing party issue has not been fleshed out fully, remand the case for further proceedings consistent with this opinion. Given our disposition of the prevailing party question, we need not address the remaining issues raised in the Government's appeal.

## I. FACTS AND PROCEDURAL HISTORY

Particularly with respect to the question whether the Dunn Group is a prevailing party, this appeal presents challenges to the fee award that are inextricably linked with the history of the litigation. We will therefore set forth in some detail the course of the relevant underlying litigation and the results it is said to have achieved.

### A. *The Underlying Litigation*
#### 1. *The Plaintiffs' Complaint*

The Dunn Group filed its complaint on March 19, 1982. Plaintiffs identified themselves as persons living, conducting business, and owning or leasing real property in proximity to the Site. They sought therein to represent a class of similarly situated persons. The complaint contained three counts, alleging both common law and statutory violations. In Count I, sounding in nuisance, plaintiffs sought an injunction that would require defendants (1) to remove all radioactive and radiation-contaminated materials from the Site and vicinity properties; (2) to repair and restore, as necessary, these properties after the removal; (3) to undertake any other acts necessary to abate the public nuisance; and (4) to desist from future dumping of any radioactive waste at the Site.

In Count II, plaintiffs sought declaratory, mandatory, and injunctive relief against DOE for its alleged failure to comply with the public participation provisions of the Uranium Mill Tailings Radiation Control Act of 1978 ("UMTRCA"), 42 U.S.C. § 7921 (1982). Specifically, plaintiffs asked the district court to issue an order declaring that DOE had failed to perform its duties under UMTRCA and ordering DOE to comply with the Act. Plaintiffs sought "funding for independent testing and epidemiological studies to be conducted by experts selected by or upon consultation with plaintiffs." App. at 37. In paragraph (c) of Count II the complaint also requested that the district court enjoin DOE from establishing priorities, selecting remedial action, and executing cooperative agreements concerning the Site until the completion of public hearings and other public partic-

---

eligible to receive an award and must provide an itemized statement of the amount sought, setting forth the actual time spent and the rate at which fees and expenses are computed. As originally submitted the petition failed both to show the amount sought and to include an itemized statement of time actually expended and an actual computation rate used for fees and expenses. Although later supplemented with the requisite information, the district court denied the fee petition on the ground that the thirty-day time limitation for filing a fee application in EAJA was "a jurisdictional prerequisite to governmental liability" and plaintiffs' failure to file a timely application deprived the court of jurisdiction over the subject matter. App. at 586.

On appeal, we read the requirements of section 2412(d)(1)(B) differently. Although noting "that time bars with respect to the *filing* of claims against the United States should be strictly construed," we concluded Congress did not intend that "strict compliance with the pleading requirement [of section 2412(d)(1)(B) ] must be accomplished within the same time as filing [of the application]." *Dunn v. United States*, 775 F.2d 99, 103 (3d Cir.1985) (emphasis in original). We reversed the district court's order denying plaintiffs' application for attorneys' fees and expenses and remanded for further proceedings. *Id.* at 105.

ipation. *Id.*[4]

In Count III plaintiffs alleged that DOE had failed to comply with the National Environmental Policy Act ("NEPA").[5] 42 U.S.C. §§ 4321–4347 (1982). Plaintiffs sought (1) a declaration that DOE's failure to prepare an Environmental Impact Statement ("EIS") for the site violated NEPA; (2) an order requiring submission of an EIS; and (3) an injunction against DOE taking any action at the Site, remedial or otherwise, until such an EIS was prepared.

On August 9, 1982, the federal defendants moved in the alternative to dismiss the complaint or for summary judgment. The motion was accompanied by affidavits of several federal officials involved with implementation of UMTRCA at the Site. However, on October 29, 1982, the district court denied this motion as "premature." App. at 399. On August 22, 1983, the federal defendants renewed their motion to dismiss as to Count III on the ground it had been mooted by the issuance of a draft EIS in December 1982 and a final EIS for the Site on August 5, 1983. Plaintiffs did not contest the renewed motion on procedural grounds, and on October 18, 1983, the district court dismissed Count III as moot. Thereafter, the parties settled the underlying litigation by entry of a consent judgment.

### 2. *The Consent Judgment*

The consent judgment was entered on May 23, 1984, stipulating that it was in "full settlement" of the Dunn Group's claims against the federal defendants and constituted a "full discharge and release" of the defendants, and that the district court retained jurisdiction over DOE and the NRC to enforce the terms of the judgment. App. at 432. The Dunn Group, however, reserved the right to participate in NRC rulemaking or licensing proceedings and to seek attorneys' fees from federal defendants. The Government, in turn, reserved the right to oppose the Dunn Group's efforts to obtain attorneys' fees and expenses.

In paragraph IV of the consent judgment the DOE and the NRC agreed to the following:

In order to resolve the remaining issues in this action, Defendants United States Department of Energy and United States Nuclear Regulatory Commission agree to the following:

A. Representatives of the United States Department of Energy or its agents will convene a meeting to which the public is invited, before the start of each construction season[,] at which time they will explain the schedule and plans for remedial action at the Canonsburg Industrial Park for that construction season.

B. Representatives of the United States Department of Energy or its agents will meet with each vicinity property owner, prior to the conduct of remedial action on the property, at which time they will explain the schedule and plan for such remedial action.

C. The United States Nuclear Regulatory Commission will notify counsel for Plaintiffs of the initiation of rulemaking or other proceedings with respect to the initial licensing of the Canonsburg Industrial Park site subsequent to the completion of remedial action on the site, by the United States Department of Energy.

App. at 431–32.

### B. *The Fee Petition*

As we have noted, *supra* note 3, the district court originally dismissed the fee

---

4. In paragraph (c) of Count II, plaintiffs requested that the Department of Energy be enjoined from:

establishing priorities for the Canonsburg Industrial Park site, selecting remedial action for the site and executing cooperative agreements until public hearings and other appropriate public participation relative to such matters, as required by UMT[RC]A, is completed.

App. at 37.

5. NEPA, *inter alia,* requires the Government to assess, in detail, the effects on the environment of any contemplated major federal action. *See* 42 U.S.C. § 4332(2)(C); Executive Order No. 11,514, 35 Fed.Reg. 4247 (1970); Guidelines of the Council on Environmental Quality, 40 C.F.R. Part 1500 (1984). For a more detailed discussion of NEPA and its relation to UMTRCA, see *infra* II.B.

petition on jurisdictional grounds and, following appeal, we reversed and remanded the matter to the district court. *See Dunn v. United States,* 775 F.2d 99 (3d Cir.1985). On remand, the district court had before it the original application, as supplemented with several affidavits and billing statements of counsel, as well as an affidavit from one plaintiff, Janis Dunn. The Dunn Group requested attorneys' fees and expenses for two law firms. For the firm of Mansmann, Cindrich & Huber, plaintiffs requested fees for hours expended in the underlying litigation and on the fee petition totaling 2732.38 hours. For the firm of Wilson, Johnson & Sweat, the Dunn Group requested compensation for a total of 424.-70 hours spent up to the time of entry of the consent judgment and the original filing of the fee petition. Additionally, both law firms asked the district court to apply a multiplier of 1.5 to reflect the supposed novelty, complexity and contingent nature of the case.

On February 6, 1986, the district court granted plaintiffs' application for fees and expenses as submitted, awarding the firm of Mansmann, Cindrich & Huber a total of $135,846.04, and the firm of Wilson, Johnson & Sweat a total of $27,161.45. The Government moved to vacate the order, however, challenging the district court's conclusion that plaintiffs were prevailing parties based upon the agreement embodied in the consent decree. On March 12, 1986, the district court vacated its February 6 opinion and order and scheduled further briefing on the fee application.[6] Thereafter, the original petition was further supplemented with additional affidavits and billing statements to reflect time expended since the filing of the original

application. On October 15, 1986, after briefing by the parties, the district court issued a second opinion and order, this time granting in part and denying in part the Dunn Group's application. The court awarded Mansmann, Cindrich & Huber a total of $126,074.20, and Wilson, Johnson & Sweat a total of $18,516.45.

In its October 15 order, the district court incorporated part of its vacated February 6 opinion and order in which it had concluded that: (1) the Dunn Group was a prevailing party within the meaning of EAJA, 28 U.S.C. § 2412(a), (d)(1)(A); and (d)(2) the position of the Government was neither substantially justified nor excused on the ground that special circumstances existed that made an award unjust. In reaching its conclusion that the plaintiffs were prevailing parties, the district court relied solely on paragraph (c) of Count II of plaintiffs' complaint and paragraph IV(A) of the consent decree. *See supra* I.A.2. In the district court's view, the Government was "required to incorporate public participation under law, ... [it] failed to do so until the filing of this suit," therefore, "the lawsuit was necessary ... to compel actions in compliance with" the law. App. at 600.[7]

## II. THE STATUTORY SCHEME

### A. UMTRCA

In 1978, Congress, concerned about possible radiation hazards to public health and environmental safety, enacted UMTRCA, 42 U.S.C. §§ 7901–7915 (1982). The purpose of UMTRCA, as expressed by Congress, was that "every reasonable effort"

---

6. In addition to challenging the prevailing party conclusion, the Government contended that the district court had disregarded its earlier decision (during a telephone scheduling conference) to bifurcate consideration of the fee petition into a statutory prerequisites phase and a computational phase. The Government contended that as to the latter, it had not yet been heard. The district court, in its order to vacate, acknowledged the conference call agreement and noted that it had not fully articulated specific findings for the February 6 fee determination.

7. As for the Government's contention that the position of the United States was substantially justified so as to preclude an award of fees under EAJA, the district court summarily rejected the Government's argument and concluded that its prelitigation inaction and failure to comply with UMTRCA prior to the commencement of plaintiffs' suit made an award of fees and expenses proper. The district court also concluded, citing *Dougherty v. Lehman,* 711 F.2d 555 (3d Cir.1983), that "no 'special circumstances' [made] the award of fees and costs in this case unjust." App. at 601.

be made to control, stabilize, and dispose of uranium mill tailings.[8]   42 U.S.C. § 7901(a).

UMTRCA establishes a complex system of oversight and responsibility for remedial action.   First, the Act creates a plan of federal-state cooperation whereby the federal government, in conjunction with those states in which inactive uranium ore processing mills are located, enters into "cooperative agreements" for site cleanup.   42 U.S.C. § 7913.   Where these agreements exist, UMTRCA provides for sharing the costs of remedial action at a site, with the federal government bearing ninety percent of the cost and the state responsible for the remaining ten percent.   42 U.S.C. § 7917.[9]

Within this system, UMTRCA mandates a three-phase program for site cleanup. Under phase one, which dictates a completion time frame of one year from enactment, the Act required the Secretary of Energy, after consultation with the EPA, the NRC, and the affected states, to designate twenty-two "processing sites" at twenty different locations specified by the Act..   42 U.S.C. § 7912(a)(1).[10]   Within the one-year time limit UMTRCA also required the Secretary of Energy to (1) "assess the potential health hazard to the public from the residual radioactive materials at designated processing sites," and (2) "rely[ing] primarily on the advice of the Administrator [of EPA,]" to establish priorities for remedial action at the sites.   42 U.S.C. § 7912(b).[11]

Following completion of the designation and prioritization phase, UMTRCA requires that the Secretary of Energy notify the governor of each affected state.   42 U.S.C. § 7912(c).   Under phase two, the Act directs the Secretary of Energy, with the concurrence of the NRC, to enter into cooperative agreements with the states in which the processing sites are located in order to provide for cleanup of the processing site and vicinity properties.   42 U.S.C. §§ 7913,

**8.**   Uranium mill tailings are the residue of metal-bearing ore after the metal has been extracted. 42 U.S.C. § 7911(8).   The House Report on UMTRCA described these mill tailings as a radioactive, sand-like waste resulting from extraction of uranium from ore for use in the nuclear fuel cycle.   *See* H.R.Rep. No. 1480, 95th Cong., 2d Sess., pt. 2, at 25, *reprinted in* 1978 U.S.Code Cong. & Admin.News 7433, 7451 [hereinafter House Report Part 2].

**9.**   UMTRCA also divides federal responsibility to carry out its terms among the DOE, the EPA, and the NRC.   The Secretary of Energy has primary responsibility for cleanup efforts at inactive mill sites.   42 U.S.C. §§ 7912–7918. UMTRCA authorizes the Administrator of EPA to promulgate generally applicable standards for DOE's planned remedial actions at these sites.   42 U.S.C. § 2022.   Finally, UMTRCA requires the NRC to concur in remedial actions undertaken by DOE, 42 U.S.C. § 7918(a)(1), and, where appropriate, to provide post-cleanup oversight to ensure proper site maintenance. 42 U.S.C. § 7914(f)(2).

**10.**   The Act named the Canonsburg, Pennsylvania, site among those locations specifically enumerated for designation.   42 U.S.C. § 7912(a)(1).   Additionally, the Act required the Secretary to "designate all other processing sites within the United States which he determines requires [sic] remedial action."   *Id.*   The Act distinguishes between the processing site, which is the actual area encompassed by the inactive uranium mill, and areas nearby those sites that are contaminated with radioactive materials derived from operation of the mills.   42 U.S.C. § 7911(6)(A), (B).   UMTRCA refers to the latter as "vicinity properties."   42 U.S.C. § 7911(6)(B). Regarding the designation of "vicinity properties," the Act states that "to the maximum extent practicable" they should be designated within the one-year time frame for processing site designations.   Unlike designation of the processing sites themselves, however, designation of vicinity properties is more complex.   The Secretary of Energy is required to identify, *i.e.*, designate, those properties that are "contaminated with residual radioactive materials derived from such [processing] site[s]."   42 U.S.C. § 7911(6)(B)(ii).   Congress provided the Secretary with some guidance for designating vicinity properties.   In making vicinity property designations, the Secretary should "use sound judgment in this regard and be concerned about costs" by being "assured that serious contamination that poses a health hazard ... actually exists."   House Report Part 2 at 35–36, 1978 U.S.Code Cong. & Admin.News 7462, 7463.

**11.**   The legislative history of UMTRCA indicates that Congress intended DOE to expend funds first on the worst sites.   *See* H.R.Rep. No. 1480, 95th Cong., 2d Sess., pt.1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 7433–50.   The Canonsburg, Pennsylvania, site was ranked among those sites with the highest priority for remedial action.   44 Fed.Reg. 74,892 (1979) (publication of DOE's final designations and priorities).

7914.[12]

Phase three incorporates the selection and performance of appropriate remedial action at each designated site. UMTRCA directs the Secretary of Energy and the participating state, with the concurrence of the NRC, jointly to select and perform the cleanup tasks. 42 U.S.C. § 7918(a)(1). The remedial action to be undertaken must comply with general standards "for the protection of the public health, safety and the environment," which the Act authorizes the EPA to promulgate within one year of enactment. 42 U.S.C. § 2022(a), (b).[13]

As the legislative history makes clear, Congress envisioned, within UMTRCA's scheme, an opportunity for the public to participate in the various phases of the Act. See House Report Part 2 at 41.[14] To that end, Congress directed the federal government to encourage "public participation" in the implementation of the Act. In § 7921, Congress mandated that:

In carrying out the provisions of this subchapter, including the designation of processing sites, establishing priorities for such sites, the selection of remedial actions, and the execution of cooperative agreements, the Secretary, the Administrator, and the Commission shall encourage public participation and, where appropriate, the Secretary shall hold public hearings relative to such matters in the States where processing sites and disposal sites are located.

42 U.S.C. § 7921 (1982). Notably, Congress left it to the discretion of the Secretary of Energy to determine the time, form, and manner of public participation in general, and to determine whether public hearings were appropriate.

Finally, UMTRCA required the Secretary of Energy to submit to Congress annual status reports on the Act's implementation beginning in 1980 and ending in 1986. 42 U.S.C. § 7924. Under this reporting section, the Secretary of Energy was required to include data of actual and estimated costs, delineate the extent of states' participation in the cleanup program, evaluate the effectiveness of remedial actions, describe any problems encountered in implementing remedial action, and, where appropriate, include the separate views of the NRC and the EPA. 42 U.S.C. § 7924(a).

### B. *NEPA*

The purpose of NEPA is to focus national policymaking on the interdependence between human beings and the environment. NEPA's "twin aims" were identified by the Supreme Court in *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983): "First, it 'places upon

---

**12.** The Act establishes the requirements for these cooperative agreements. Specifically, states must assume certain responsibilities under the agreements in order for the federal government to assume ninety percent of the cost of remedial action. These state responsibilities include: (1) acquiring title to the designated processing site itself and to any property at which permanent disposal of removed radioactive material is planned, 42 U.S.C. § 7914(a), (c); (2) obtaining consent of owners of designated vicinity properties to permit performance of remedial action on such properties, 42 U.S.C. § 7913(c); (3) providing for access to vicinity properties for purposes of inspection, 42 U.S.C. § 7913(d); and (4) agreeing to transfer title to the federal government in the event radioactive materials from the site are permanently disposed of in place, 42 U.S.C. § 7914(e)(1), (f)(1).

**13.** In fact, the EPA was unable to meet the one-year statutory deadline for promulgation of these general remedial action standards. This had the effect of delaying the implementation

activities of the Secretary of Energy and the respective states. See 42 U.S.C. § 7918(a)(2).

**14.** The legislative history of the public participation provision in the Act states, in its entirety:

This section directs the DOE, EPA, and NRC to allow the public an opportunity to participate, particularly at the local level, in the designation of processing sites and the establishment of priorities, and in the selection of depository sites, the execution of cooperative agreements, and other matters. Hearings at the local level are required where requested. The objective is to give the people and officials affected an opportunity to learn what is planned for their area and its impact on them. It is not intended that hearings be held at all sites, however. Moreover, it is expected that this provision will not delay the program, but should be helped [sic] in gaining public support.

House Report Part 2 at 41, U.S.Code Cong. & Admin.News 1978, at 7468.

an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.' [quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 553 [98 S.Ct. 1197, 1216, 55 L.Ed.2d 460] (1978).] Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* at 97, 103 S.Ct. at 2252 (citing *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981)).

As implemented, NEPA requires, *inter alia,* that federal agencies assess the effects of proposed major federal actions on the human environment. *See* 42 U.S.C. § 4332(2)(C); Executive Order No. 11,514, 35 Fed.Reg. 4247 (1970); Guidelines of the Council on Environmental Quality, 40 C.F.R. Part 1500 (1987). NEPA requires preparation of one of three types of analyses. First, where the action may have a significant impact, an environmental assessment must be performed to determine whether an environmental impact statement (EIS) is necessary. 40 C.F.R. § 1508.9. If an agency determines that an EIS is not required because the action has been determined not to have a significant impact, NEPA requires that the agency set forth its reasons in a Finding of No Significant Impact ("FONSI"), 40 C.F.R. § 1508.13. Finally, if the action will significantly affect the environment, an EIS must be prepared. 40 C.F.R. § 1502.

■ Although UMTRCA does not explicitly direct the Secretary of Energy to comply with NEPA, it does so indirectly and, at all events, it is clear that the remedial action to clean up radioactive and radiation contaminated materials from inactive uranium mill sites and their environs contemplated by UMTRCA implicates NEPA's requirements.[15]

We turn to the record of the Government's compliance with UMTRCA. Our discussion in the following section focuses primarily on the federal defendants' actions relative to the Canonsburg Site, but where necessary we will note other governmental activities as well.

## III. COMPLIANCE CHRONOLOGY

During the course of the underlying litigation and action on the fee petition, the Government submitted several affidavits from federal officials responsible for implementation of UMTRCA. The Government supplemented these affidavits with numerous exhibits and documents, most of which were of public record, delineating the federal defendants' actions in compliance with UMTRCA and NEPA. The Government has contended throughout the underlying litigation, the fee application litigation, and in the instant appeal, that DOE was fulfilling its obligations under UMTRCA's public participation provision prior to the initiation of the litigation on March 19, 1982. *See* 42 U.S.C. § 7921. In support of its contention the Government offered, *inter alia,* the affidavit of Jan W. Mares, Acting Undersecretary of Energy ("Mares Affidavit"), along with seven exhibits including DOE's Public Participation Plan which was dated February 1982. We will describe this information at some length because it is crucial to our review of the district court's determination that the Dunn Group was a prevailing party. We will divide our discussion into five parts: (1) general compliance with UMTRCA; (2) compliance with NEPA requirements; (3) action relative to UMTRCA's public participation provision; (4) the plaintiffs' submissions in support of their claim to prevailing party status; and (5) the district court's fact finding on the prevailing party question.

### A. *UMTRCA*

On September 5, 1979, the Secretary of Energy announced DOE's proposed designations and priorities for remedial action and invited public comment. *See* 44 Fed.

---

**15.** Relative to the Canonsburg Site, the Secretary of Energy determined that preparation of an EIS was required before remedial action could be undertaken at the Site. *See* 1980 Annual Status Report on the Uranium Mill Tailings Remedial Action Program, U.S. DOE, at 11 [hereinafter Annual Report, with the appropriate year].

Reg. 51,894 (1979). On November 8, 1979, within the one-year statutory time limit, DOE published its final designations and priorities. *See* 44 Fed.Reg. 74,891 (1979). In both the proposed and final versions, Canonsburg appeared as a designated site and was ranked among those locations with the highest priority for remedial action.

Despite the one-year deadline in UMTRCA, the wheels of clean-up moved very slowly for a variety of reasons. Following the designation of processing sites and the establishment of priorities, DOE began negotiations with the Commonwealth of Pennsylvania for a cooperative agreement pursuant to 42 U.S.C. §§ 7913–7914. DOE and the Commonwealth entered into a cooperative agreement effective September 30, 1980. The agreement required, *inter alia,* that the Commonwealth acquire title to the area designated as the Canonsburg processing site. During 1981 the Commonwealth attempted to acquire title to the land through negotiations; however, this proved unsuccessful and it finally acquired the Site through exercise of its power of eminent domain on February 10, 1982. Once title was vested in the Commonwealth, those federal and state officials responsible for implementing UMTRCA at the Site were able to conduct necessary scientific feasibility studies with regard to the various proposals for remedial action. *See* 1982 Annual Report at 3, 5, 8–9.

UMTRCA mandated that EPA promulgate general environmental and public health standards to guide cleanup efforts at inactive mill sites within one year of its enactment or by November 8, 1979. 42 U.S.C. § 2022(a). The Act made these EPA standards a prerequisite for DOE's selection and performance of remedial action at any site. 42 U.S.C. § 7918(a)(1). EPA did not meet the Act's original one-year deadline, but, beginning in early 1980, EPA promulgated certain proposed and interim standards.[16] In 1982, Congress gave EPA an extension of time in which to promulgate final standards. *See* Pub. L. No. 97–415, § 18, 96 Stat. 2077, now codified at 42 U.S.C. § 2022(a).[17]

Following the issuance of a Final EIS and its adoption by the Secretary of Energy in September 1983, DOE issued its formal "Remedial Action Plan for Stabilization of the Inactive Uranium Mill Tailings Site at Canonsburg, Pennsylvania" ("Final Plan") in October 1983. In order to implement the stabilization-in-place plan for radioactive and radiation-contaminated wastes at the processing site, the boundaries of the Site had to be expanded to meet certain engineering requirements. To facilitate commencement of remedial action in the spring of 1984, DOE acquired the additional land itself through the United States Army Corps of Engineers. Thereafter, DOE began preparation work at the Site and proceeded with the design phase of remedial action. Construction work necessary to implement cleanup at the Site was one-fourth complete by the end of fiscal 1984, and was actually completed by 1985 year's end.

---

16. *See supra* page 1425 for an explanation of phase one. In April 1980, EPA proposed standards for vicinity property cleanup activities, which it published as both proposed standards and interim standards to enable DOE to begin remedial action at some vicinity properties. *See* 45 Fed.Reg. 27,366, 27,370 (1980). In December 1980, EPA issued a second set of proposed standards governing the disposal of mill tailings removed from processing sites and vicinity properties. *See* 46 Fed.Reg. 2,556 (1981). Along with notice of the second set of standards, EPA extended the period for public comment on the first set. *Id.* Public hearings on both sets of standards were held in Salt Lake City, Utah, Durango, Colorado, and Washington, D.C.

17. In the event that the EPA failed to promulgate final standards by October 31, 1982, Congress directed DOE to initiate remedial actions at designated sites using EPA's proposed standards. *See* 42 U.S.C. § 7918(a)(3) (1982). These congressional amendments were not effective until January 4, 1983, and on January 5 of that year EPA published its final standards. *See* 48 Fed.Reg. 590, 602 (1983) (codified at 40 C.F.R. Part 192 (1987)).

The standards were attacked by environmental and industry groups as being too lenient and too rigorous, respectively. They were, however, ultimately upheld. *See Am. Mining Cong. v. Thomas,* 772 F.2d 617, 638 (10th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2275–76, 90 L.Ed.2d 718 (1986).

DOE was presented with additional challenges concerning the effectuation of remedial actions at vicinity properties (as opposed to the Site, *see supra* n. 10). The identification of vicinity properties by DOE involved aerial, mobile van, and on-site radiological surveys conducted from April 1980 to June 1982. At the time of DOE's issuance of an environmental assessment for vicinity properties at Canonsburg· in July 1982, the Department had identified 100 such properties,[18] cleanup of which began on October 7, 1982.[19]

### B. *NEPA*

In 1979, DOE determined that implementation of UMTRCA would require preparation of an EIS for the Canonsburg processing site pursuant to NEPA. In accordance with the Secretary of Energy's decision, federal and state officials began to collect information and to analyze remedial action alternatives for Canonsburg. In April 1981, DOE issued a draft of the "Remedial Action Concept Paper" ("RACP"), which set forth, *inter alia*, the objectives of remedial action, evaluative criteria for selecting a remedial action option, and various cleanup options. On May 15, 1981, DOE published notice of its intent to prepare an EIS "to assess the environmental implications of remedial action ... on the ... [S]ite and vicinity properties in and near Canonsburg." 46 Fed.Reg. 26,807, 26,807 (May 15, 1981). The May 15 notice provided background information on the Site, explained the purpose of an EIS, set forth the three remedial action options contemplated at that time, invited public comment, and established a meeting schedule for members of the public to express their views to DOE. *Id.* at 26,808–810.

Following its announcement of intent to prepare an EIS, DOE completed a draft EIS ("DEIS"). The DEIS, pursuant to sec-tion 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), set forth, *inter alia:* (1) the environmental impact of the proposed action; (2) adverse consequences that were unavoidable should the proposal be implemented; (3) alternatives to the proposed remedial action; (4) the relationship between short-term uses of the environment and the long-term maintenance and enhancement of the environment's productivity; and (5) irreversible or irretrievable resource commitments involved in the implementation of the proposed action. DOE issued the DEIS for public comment in December 1982. Subsequently, DOE issued a Final EIS with respect to the Site on August 5, 1983, and published notice of its availability on August 12, 1983. Both the DEIS and the Final EIS recommended to the Secretary of Energy that disposal of radioactive and radiation-contaminated wastes be accomplished through "stabilization-in-place." *See* Supp.App. Vol. 2, Ex. H. On September 21, 1983, the Secretary of Energy formally adopted the stabilization-in-place recommendation with the concurrence of the NRC and the Commonwealth of Pennsylvania.

As for the cleanup of vicinity properties, DOE prepared and issued an environmental assessment with an accompanying FONSI, having determined that preparation of an EIS was not necessary. *See* 47 Fed.Reg. 31,061 (July 16, 1982). DOE decided it was necessary to proceed with vicinity property cleanup in advance of remedial action at the Site itself in order to provide relief to the vicinity property owners as expeditiously as possible.

### C. *Public Participation Under UMTRCA*

Shortly after the passage of UMTRCA, DOE began a program of public information and participation on the development

---

**18.** Cleanup efforts at vicinity properties were delayed by a Canonsburg Borough ordinance, which, among other things, prohibited transport of any radioactive materials within the Borough. This ordinance, in effect, prohibited the removal of radioactive materials from the vicinity properties to the site where these materials would be stored pending the selection of a dis-posal option. The Borough ultimately repealed the ordinance.

**19.** By September 1983, DOE completed remedial action at twenty-nine vicinity properties; and by October 1985 remedial action was completed for all vicinity properties, which by 1985 numbered 156.

of a remedial action plan at the Canonsburg Site. On November 29–30, 1978, representatives from DOE and the Oak Ridge National Laboratory held two public meetings in the Canonsburg area to discuss the process of designation and prioritization for the Site. On April 18, 1979, DOE met with members of the Advisory Committee on Atomic Energy Development and Radiation Control of the Pennsylvania Department of Environmental Resources ("DER"), nine of whose eleven members were members of the general public, to discuss designation, priorities, and the status of cleanup at the Site. In September 1979, DOE met with the Canonsburg Town Council and the North Strabane Township Board of Supervisors to discuss development of a remedial action plan ("RAP"). The latter meeting was open to the general public, and both of the meetings were reported in local newspapers. On November 28–30, 1979, DOE met with local officials, including the mayor, council members, and the town manager of Canonsburg. Additionally, on March 29, 1979, October 25, 1979, and November 2, 1979, DOE issued press releases in area newspapers discussing radon exposure and DOE's monitoring program, and inviting public participation. Moreover, DOE published two Federal Register notices regarding designation and priorities, the first of which, issued on September 5, 1979, asked for public comment on DOE's proposals. 44 Fed.Reg. 74,891 (Dec. 18, 1979) (final designations and priorities); 44 Fed.Reg. 51,894 (Sept. 5, 1979) (notification of proposed designations).

In February 1980, DOE met with the Southwestern Pennsylvania Chapter of the Sierra Club, at a session open to the public, to discuss development of a RAP for the Site. During the month of April 1980, DOE contacted Canonsburg officials and members of the public to apprise them of the results of aerial surveys.

On April 30 and May 1, 1981, DOE officials met with officials of the Pennsylvania DER, at meetings open to the general public, in North Strabane and Burgettstown,

Pennsylvania, to discuss remedial action options and selection of a disposal site. Notice of these meetings appeared in a local newspaper article on April 29, 1981. On June 3–4, 1981, DOE, its contractors, the Pennsylvania DER, and the NRC held three public "scoping" meetings regarding the DEIS in North Strabane, Burrell Township, and Paris, Pennsylvania.[20] Several plaintiffs attended these meetings, including Janis Dunn, who submitted a prepared paper and presented a statement at the meeting. Notice of these meetings appeared on May 15, 1981 in the Federal Register and in the local news media by way of a DOE press release appearing in local papers. See 46 Fed.Reg. 26,807 (May 15, 1981). On November 13, 1981, a public meeting was held with the North Strabane Board of Supervisors and thirty-five citizens to discuss cleanup of vicinity properties. Notice of this meeting appeared in a local newspaper article.

From June 1981 through December 1981 DOE and its contractors held several individual meetings with members of the public to discuss RAP options, vicinity property cleanup, permit requirements, and access agreements. For informational purposes, one of these meetings, on June 2, was held in the home of plaintiff Janis Dunn, who also attended the meeting held in Canonsburg on November 19, 1981. On May 19, October 19 and 28, and November 19, 1981, DOE or its contractors met with various local government officials to discuss RAP options and selection, selection of a disposal site, permit requirements, and access agreements, and to make a status report.

Throughout 1981, in addition to the meetings discussed above, DOE engaged in other activities to disseminate information to the public and to engage the public's participation. These activities included: (1) correspondence from DOE officials to thirty-nine members of the public informing them that public meetings would be held before a decision on disposal of the tailings was made; (2) a press conference with Canons-

---

**20.** "Scoping" is the "early and open process for determining the scope of issues to be addressed [in the EIS] and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7 (1987).

burg and Pittsburgh news media discussing the RAP; (3) press releases and newspaper articles announcing visits of DOE officials and other relevant matters; (4) newspaper access to technical documents regarding site suitability and evaluation of area residues; (5) distribution of the Draft RACP to local elected officials, the news media, plaintiff Janis Dunn, Agnes Engel (President of United Citizens Against Radiation Exposure), and other members of the public; (6) filing of the proceedings of the June 3 and 4 public scoping meetings on an EIS at various area public libraries; (7) distribution of an Evaluation of Site Suitability for Canonsburg Residues and a Preliminary Evaluation of Areas for Canonsburg Residues to area libraries, federal, state and local officials, plaintiff Janis Dunn, Agnes Engel, and other interested members of the public; (8) telephone calls and letters to individuals to respond to individuals' concerns and to answer questions regarding the project; and (9) periodic distribution of informational brochures about radiation and mill tailings. Finally, approximately twenty news items appeared in area newspapers in 1981, which reported on various meetings held that year and reprinted the Draft RACP as well as other documents and publications issued by DOE with regard to the Canonsburg Site.

DOE and its contractors held individual meetings in Canonsburg on January 12–13, 1982 with plaintiff Jean DeLost and area residents in attendance to discuss the impact of remedial action on property owners and remedial agreements; in Houston, Pennsylvania, on January 25–26, 1982, to discuss the impact of cleanup on vicinity properties and remedial action agreements; and in Canonsburg on March 1, 1982, to discuss RAP options with plaintiff Janis Dunn, her attorney, and twelve neighbors. On January 12–13, 1982, DOE met with the

Canonsburg Town Council to discuss vicinity property cleanup and access agreements.

In February 1982, DOE issued its Public Participation Plan ("PPP") for unlimited distribution. The PPP outlined public involvement and participation in various aspects of the cleanup at Canonsburg. It delineated a comprehensive scheme, including mechanisms formally required by law for compliance with NEPA, and provided for informal mechanisms such as informational meetings, informal meetings, explanatory meetings prior to the commencement of each construction season at a site, media releases, and responses to information requests.[21]

## D. *Plaintiffs' Submissions*

We note, as a preliminary matter, that the record is almost completely devoid of documentary submissions by plaintiffs or their counsel that counter or contradict the Government's voluminous documentation of compliance with the public participation provision of UMTRCA prior to the filing of the Dunn complaint. In fact, plaintiffs, in their Brief in Opposition to the Federal Defendants' Motion to Dismiss in the district court, did not controvert the Government's contention that it had complied with the public participation requirements of the Act. Rather, plaintiffs relied essentially on the argument that the opportunities for public participation provided by the Government were inadequate, an argument on which the district court did not rule.

The plaintiffs' sole submission was the affidavit of Janis Dunn. Dunn's affidavit, filed on August 30, 1984, related her opinion that before the lawsuit "all they [the Government] did was monitor, despite our efforts with telephone calls, letters and *meetings*," but after filing of the lawsuit

21. Finally, on January 11–12, 1983, after DOE had issued a DEIS, DOE held three public meetings in the Canonsburg area to solicit public comment on the DEIS. After conclusion of these public hearings, DOE issued its Final EIS taking into account public comment received on the DEIS. In October 1983, DOE issued its Final Plan for Canonsburg. Like the PPP, the Final Plan stated that DOE would hold public

meetings prior to and during the construction necessary to implement the stabilization-in-place option selected for the Site. DOE held such meetings in October and December 1983 and continued this practice before the start of the construction seasons in 1984, 1985, and 1986. In addition, numerous other public participation activities occurred shortly after the filing of the complaint.

"things started to happen quickly" and not until after filing did "they beg[i]n calling *more frequent meetings.*" App. at 580 (emphasis added). However, the affidavit did not controvert any of the Government's affidavits and exhibits showing its public participation activities both before and during the pendency of the underlying litigation. Dunn's affidavit pointed to no facts in the record in support of her affidavit and attached no exhibits. By implication, Dunn admits in her affidavit that the Government did in fact hold meetings prior to and during the lawsuit. Much of Dunn's affidavit does not even address the public participation issue; instead it simply expresses her opinion that the Government was not acting quickly enough with the cleanup itself.

### E. The Prevailing Party Determination

In its partially vacated opinion of February 6, 1986, and its final opinion of October 15, 1986, the district court made no reference either to the Government's affidavits and exhibits in support of its claim of compliance with the public participation provision or to Dunn's affidavit, which was attached to the application for attorneys' fees. The district court's discussion of the prevailing party issue amounts to three paragraphs. It makes but one finding of fact, recites the relief requested, and quotes from a portion of the consent judgment in support of its conclusion that plaintiffs were prevailing parties.[22] Plaintiffs contended that the public participation provided was inadequate, and the district court summarily found that the Government had not complied with UMTRCA's public participation provisions until plaintiffs filed the lawsuit, and that the lawsuit was necessary to compel compliance. As we shall explain, see *infra* Part V, that finding was clearly erroneous.

### IV. EAJA

#### A. Statutory Language

The Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), establishes two important prerequisites to any award of attorneys' fees and expenses: the district court is required to award attorneys' fees to prevailing parties where the Government's position is not substantially justified and no special circumstances exist to make a fee award unjust.[23] *See Tressler v. Heckler,* 748 F.2d 146, 149 (3d Cir.1985). The party

---

**22.** The court's entire discussion (contained in its February 6, 1986 opinion and readopted in its October 15, 1986 opinion) is as follows:

Defendants contend that the plaintiffs are not "prevailing parties" within the meaning of 28 U.S.C. § 2412(a) and (d)(1)(A) and that therefore an award of attorneys' fees and expenses or costs is not authorized under EAJA. However, the plaintiffs' view the matter differently and contend that in plaintiffs' complaint, it was specifically requested that the defendant, Department of Energy, be enjoined from establishing priorities for the Canonsburg Industrial Park Site, selecting remedial action for the site and executing cooperative agreements until public hearings and appropriate public participation relative to such matters as required by UMTA is completed.

In Paragraph IV of the Consent Judgment, it plainly states that:

Representatives of the United States Department of Energy or its agents will convene a meeting to which the public is invited, before the start of each construction season at which time they will explain the schedule and plans for remedial action at the Canonsburg Industrial Park for that construction season.

While the defendants correctly assert that they were required to incorporate public participation under law, they failed to do so until the filing of this suit. The lawsuit was necessary not to restate the law, but rather to compel actions in compliance with it.

Guided by the recent holding in *Helms v. Hewitt,* [780 F.2d 367 (3d Cir.1986) ], we can only conclude that prevailing party status warranting an award of attorney fees exists here in favor of the plaintiffs.

App. at 599–600, 988.

**23.** The Act provides, in relevant part:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (1982).

claiming prevailing party status bears the burden of proof.

The threshold inquiry for a district court when presented with an application for attorneys' fees is whether the claimant qualifies as a prevailing party. We have stated in the context of fee awards under the Civil Rights Attorneys' Fee Act of 1976, 42 U.S.C. § 1988 (1982), that no conclusive weight should be given to the form of the judgment; rather, to determine prevailing party status "we look to the substance of the litigation's outcome." *Ross v. Horn*, 598 F.2d 1312, 1322 (3d Cir.1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). In this regard, we have noted that Congress has demonstrated its intent that the term "prevailing party" in EAJA be interpreted consistently with the law as developed under similarly worded statutes. *See Brown v. Secretary of Health & Human Servs.*, 747 F.2d 878, 882 (3d Cir.1984) (citing H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4984, 4990). A claimant may be a prevailing party although the litigation ended in settlement through entry of a consent decree rather than a final judgment on the merits. *See Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980) (citation omitted); *accord, Hewitt v. Helms*, —— U.S. ——, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987).

The test for prevailing party status is essentially a twofold inquiry. Although framed in various ways, the first part of the test "is whether plaintiff achieved some of the benefit sought by the party bringing the suit." *Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 910 (3d Cir.1985) (quoting *NAACP v. Wilmington Medical Center, Inc.*, 689 F.2d 1161, 1167 (3d Cir.1982), *cert. denied*, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983)). The second part of the prevailing party test is that of causation, *i.e.*, whether the "litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.'" *Institutionalized Juveniles*, 758 F.2d at 916 (quoting *Sullivan v. Commonwealth of Pa. Dep't of Labor &*

*Indus.*, 663 F.2d 443, 452 (3d Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982)). Thus, the plaintiff's lawsuit need not be the sole cause of defendant's action. *See Morrison v. Ayoob*, 627 F.2d 669, 671 (3d Cir.1980) (per curiam), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981). Moreover, as we held in *Wilmington Medical Center*, 689 F.2d at 1169, a district court must apply the most expansive definition of causation. The district court must determine whether the plaintiff's lawsuit is causally linked to the relief obtained, *i.e.*, whether it changed the defendant's conduct or the action to be undertaken. *See Sullivan*, 663 F.2d at 452.

### B. *Scope of Review*

■ Before we can examine the district court's conclusion in this case, we must determine the appropriate standard of review. The key question regarding Dunn's prevailing party status revolves around the second element of the test—causation. We need not address the scope of review regarding any other elements of prevailing party status. In *Institutionalized Juveniles*, we held that a district court's conclusions as to causation are reviewable under a clearly erroneous standard because they depend, in large measure, on the district court's "experience with and assessment of the facts and history of the litigation." 758 F.2d at 916. Although the district court held no hearing on either the underlying litigation or on the fee petition and relied solely on certain affidavits and documents submitted by the parties, because the determination required such an "assessment of the facts and history of the litigation," we believe the clearly erroneous standard properly defines our scope of review of the prevailing party question presented in this appeal.

### V. DUNN'S PREVAILING PARTY STATUS

We turn finally to the district court's conclusion that plaintiffs were prevailing parties under EAJA. The basis for this

conclusion is unclear from a reading of its brief treatment of the issue. *See supra* n. 22. On the one hand, the district court may have concluded that the Dunn Group was a prevailing party based solely on its comparison between paragraph (c) of the prayer for relief in Count II of plaintiffs' complaint and paragraph IV(A) of the consent judgment.[24] Plaintiffs' prayer in paragraph (c) sought an injunction against DOE prohibiting it from establishing priorities, selecting remedial action, and executing a cooperative agreement until "public hearings and other appropriate public participation ... is completed." App. at 37. In paragraph IV of the consent judgment DOE merely agreed to convene pre-construction public meetings to explain upcoming cleanup activities at the Site. On the other hand, the district court stated that the federal defendants "failed" to "incorporate public participation ... until the filing of this suit" and that the plaintiffs' lawsuit "was necessary ... to compel [governmental] actions in compliance with" the law. App. at 600. This arguably was a finding, albeit a conclusory one, hence we will treat it as such.

The district court's finding is plainly contradicted by the only factual evidence in the record. Notably, the Dunn Group did not introduce any evidence on the public participation issue and did not dispute, either in the district court or in this court, any of the Government's assertions regarding implementation of UMTRCA, compliance with NEPA, and remedial action at the Site. *See, e.g.,* Plaintiffs' Brief in Opposition to Federal Defendants' Motion to Dismiss, App. at 366–71; Affidavit of Janis Dunn, App. at 579–83. At oral argument, plaintiffs' counsel admitted that the district court's conclusion, although favorable to them, was not properly fleshed out with specific findings of fact. With respect to the district court's specific conclusion, DOE announced its plan to hold such pre-construction meetings as early as February 1982 in its Public Participation Plan, simply reiterated this plan in the final plan distrib-

uted in October 1983 and held its first pre-construction meetings in October and December 1983, as soon as remedial action was initiated.

Moreover, prior to the March 19, 1982 filing of the plaintiffs' complaint the Government held eleven public meetings in the Canonsburg area with township governments, state agencies, public interest groups, and citizens concerning designation of the Site, development of the remedial action program and options thereto, and vicinity properties clean-up. Additionally, in June 1981 DOE held two public "scoping" meetings on the preparation of a DEIS. Between June 1981 and March 1982, the Government also held at least nine meetings with individual members of the public to discuss, *inter alia,* options for remedial action and vicinity area cleanup. Plaintiff Janis Dunn attended two of these meetings, one of which was held at her home. In addition to meetings, DOE distributed various technical documents, issued press releases and Federal Register notices, and responded to telephone calls from the public and the media. All of these events were established in the record through affidavits and exhibits submitted by the Government. As early as February 1982, before plaintiffs commenced this litigation, the Government's PPP included plans to hold pre-construction meetings.

We are mindful of the obligations imposed upon the Government by the public participation provision in UMTRCA, namely, to "encourage public participation." *See* 42 U.S.C. § 7921. The Act does not prescribe the types of public participation, but rather leaves formulation of opportunities for public participation to the DOE, EPA, and NRC. We are also mindful that plaintiffs under EAJA need establish no more than that they received some of the benefit of the same general class of relief as that sought and that the litigation was no more than a "material contributing factor" in obtaining the desired relief. *Sullivan v. Commonwealth of Pa. Dep't*

24. *See supra* page 1422 for a discussion of Count II, and page 1423 for a quotation of paragraph IV of the consent judgment.

*of Labor & Indus.*, 663 F.2d at 452. The present record can leave one with no doubt that the "relief" embodied in paragraph IV(A) of the consent judgment was no more than "simply a gratuitous judicial endorsement of ... administrative action [which] did nothing to advance the plaintiff[s'] claim for relief," *Institutionalized Juveniles*, 758 F.2d at 915 (citations omitted). Indeed it seems doubtful that the chronology of events in this case could in fact be read to demonstrate a causal relationship between the Government's actions with regard to public participation and the Dunn Group's lawsuit even under the expansive causation standard applicable in EAJA cases. *See Wilmington Medical Center*, 689 F.2d at 1169. *Cf. Ross v. Horn*, 598 F.2d at 1322 (requiring a district court to "conduct an inquiry to determine whether the lawsuit was the catalyst for the implementation of all or any" of the sought-after relief).

■ Despite our serious reservations as to the likelihood that plaintiffs can sustain their burden of proof on the critical issue of causation in light of the Government's significant evidence to the contrary, we will nonetheless remand the case for further proceedings for two reasons. As we have explained, the district court did not make adequate findings of fact as our jurisprudence requires, and those findings it made were clearly erroneous in light of the record. However, it is possible that the district court might be able to justify its determination to award counsel fees by such findings. We give life to that possibility, even if unlikely, because, notwithstanding our recitation of the government's record of compliance with the statutory scheme, the plaintiffs make a forceful submission that the government did not move with lightning speed. Given the toxic nature of the substances involved, perhaps the district court may find some justification in the record for a conclusion that the plaintiffs conferred a significant benefit by getting the government to move faster, even if only incrementally.

Second, and more important, plaintiffs may have been lulled into a false sense of security (and into making a poor strategic judgment not to adduce additional evidence) by the manner in which the district court decided the case. Following our initial remand, the district court summarily granted the fee petition. The district court then vacated its order following receipt of the government's petition for reconsideration which, *inter alia*, contended that the district court had disregarded its earlier conference call decision to bifurcate consideration of the fee petition into a statutory prerequisites phase and a computational phase, and that as to the latter, the Government had not yet been heard. The district court, in its order of vacatur, merely acknowledged the conference call agreement and noted that it had not fully articulated specific findings for the February 6 fee determination.

The plaintiffs thus may have been lulled into believing that it was unnecessary for them to adduce additional evidence before the district court, an impression that would have been confirmed by the fact that, in the opinion that is the subject of this appeal, the district court merely adopted its previous findings. In view of this possibility and the further possibility that the plaintiffs may be able to produce sufficient facts in support of their claim to prevailing party status, we will afford plaintiffs an opportunity to make their case for attorneys' fees and afford the district court the opportunity to fulfill its fact finding obligations.

## VI. CONCLUSION

For the reasons stated above, the judgment of the district court awarding attorneys' fees and expenses directly to plaintiffs' counsel will be vacated and the case remanded for further proceedings consistent with this opinion. Parties to bear their own costs.