Bennett RITTER, Plaintiff,

v.

THE CLINTON HOUSE RESTAU-
RANT, Sidrounda LLC, Pandelis Gia-
lias, Mary Ann Gialias and Peter Gia-
coumpoulis, Defendants.

Civil Action No. 96–3091(MLC).

United States District Court,
D. New Jersey.

Sept. 27, 1999.

Anthony J. Brady, Jr., Voorhees, NJ, for Plaintiff.

Donald E. Souders, Jr., Phillipsburg, NJ, for Defendant Clinton House.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the application by plaintiff for attorneys' fees under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and 42 U.S.C. § 1988, and the cross-motion by defendant for attorneys' fees pursuant to Federal Rule of Civil Procedure 11 ("Rule 11") and Local Civil Rules 54.2 and 11.3. The Court ordered a hearing to determine the factual issues presented by the motions. After considering the evidence, the Court finds that plaintiff is not a prevailing party under the relevant legal principles. Accordingly, we will deny plaintiff's application for counsel fees on that basis. We also will deny defendant's motion for attorneys' fees under Rule 11.

## I. *PROCEDURAL HISTORY*

This action began with the filing of a Complaint on July 1, 1996 by plaintiff Bennett Ritter against defendant "The Clinton House Restaurant," alleging discrimination in violation of the ADA and New Jersey law with respect to the architecture of the restaurant facilities. Plaintiff is a disabled individual who utilizes a wheelchair. The attorneys of record throughout this case are Anthony J. Brady, Jr. for plaintiff and Donald E. Souders, Jr. for defendant. The Answer (filed on behalf of "The Clinton House") stated that the Complaint failed to properly name and identify the defendant, and that the named defendant does not exist. In addition to general denials of liability, the Answer contained various affirmative defenses including an allegation that the Complaint was filed in contravention of Rule 11.

The court docket entries reflect that over the ensuing eighteen months, the only interactions of the parties with the Court consisted of the initial in-person scheduling conference with the Magistrate Judge on October 9, 1996, followed by six periodic

telephone scheduling conferences initiated by the Magistrate Judge between October 30, 1996 and September 3, 1997. By letter dated January 23, 1998, an attorney writing from the law office of counsel for plaintiff requested that the Magistrate Judge cancel the Pretrial Conference scheduled for January 28, 1998, stating as follows:

> This letter is to inform Your Honor that the plaintiff and the defendant have reached a settlement in regard to the equitable relief sought in this matter. Consequently, the remaining issue in this case is the matter of attorneys fees. Mr. Souders and I have agreed that the issue of attorneys fees should be resolved by a motion to be filed by Mr. Brady. Therefore, I respectfully request that, in light of these developments, the Pretrial conference be canceled.

(P–28.)[1] At that point the Pretrial Conference was canceled by the Magistrate Judge and no further proceedings were scheduled. An administrative dismissal order was then entered by the Court, which was later vacated.[2]

Counsel for plaintiff filed a motion the following month, on February 24, 1998, seeking attorneys' fees as prevailing party, and moving to add certain persons who were allegedly the owners of The Clinton House Restaurant ("Clinton House") as additional defendants. Defendant cross-moved for attorneys' fees under Rule 11. After listening to oral argument on the cross-motions, we issued an Order entered April 7, 1998 in which we denied the attorneys' fee motions without prejudice and ordered an evidentiary hearing on the contested issues of fact.[3] That hearing was conducted on December 4, 1998, February 25, 1999 and May 20, 1999. The parties reserved the opportunity to provide written closing arguments, and the supplemental submissions were completed in July, 1999.

The persons who testified at the hearing were plaintiff Bennett Ritter; plaintiff's counsel Anthony J. Brady, Jr.; plaintiff's expert witness James V. Williams; defendant's former architect Lewis Salamone; defendant's former restaurant design consultant Chris Stegemann (by deposition *de bene esse*); and defendant's witness Pandelis Gialias. Hearing exhibits were marked into evidence. We have also reviewed relevant materials in the form of affidavits, certifications, briefs and court files.[4] Although many of the historical

---

1. References to "P" or "D" denote exhibits marked in evidence at the evidentiary hearing. Other documentary evidence in the form of pleadings, affidavits, certifications, briefs or other contents of court files will be identified accordingly. All material will be quoted verbatim.

2. The case was dismissed without prejudice by Order entered January 27, 1998, which Order was vacated upon review of the cross-motions which gave rise to these additional proceedings.

3. The parties were directed to the Magistrate Judge for resolution of plaintiff's motion to amend the pleadings, which motion was granted on June 1, 1998. The "First Amended Complaint," filed pursuant thereto on June 11, 1998, named additional parties "Sidrounda, L.L.C. and/or Pandelis Gialias, Mary Ann Gialias, Peter A. Giacoumpolos." The substantive allegations and demands for relief in that pleading were identical to those in the original Complaint.

There is no record on the docket of the Court that plaintiff ever served the First Amended Complaint upon the additional defendants, or that they ever filed an answer or appearance in the case. Accordingly, the only defendant actually joined in the case is Clinton House, which answered the original Complaint denying that it is an entity with any legal existence. We will refer in this opinion to Clinton House as "defendant."

4. Some of the additional relevant case materials which we have reviewed include plaintiff's brief in support of his motion for fees, submitted 2–24–98 ("Pl.'s Main Br."); defendant's brief in support of its cross-motion for fees, submitted 3–23–98 (Def.'s Main Br.); plaintiff's reply brief, submitted 3–30–98 ("Pl.'s Reply Br."); defendant's letter brief dated 4–1–98; and plaintiff's closing brief, submitted 6–1–99 ("Pl.'s Clos. Br."); as well as additional materials identified in the text.

facts are undisputed, the parties hotly contest the ultimate factual issue of whether plaintiff was the prevailing party, for purposes of obtaining an award of fees and costs. They are equally opposed on the issue of whether the conduct of plaintiff's counsel warrants Rule 11 sanctions.

## II.  BACKGROUND

The facts set forth in this section are the undisputed historical facts established in the record. The disputed issues of fact are addressed in the Discussion section, *infra.*

### A.  The Setting

The Clinton House property consists of a large three and a half story colonial-style frame and stone building dating back approximately 200 years, occupying approximately one block of frontage on West Main Street in Clinton, New Jersey. (P–2, –17, –20, –25; Gialias Test.) In the modern era it has been operated as a restaurant, and was purchased by its present owners for that purpose on October 30, 1995.[5] The sellers were Oscar and Rosemarie Zierer and OsMar, L.L.C., who sold the real estate, fixtures, furniture, equipment, liquor license and goodwill for a combined price of $875,000, of which the real estate including the building cost $575,000. (Gialias Test.) The property was sold in an "as is" condition, and required several hundred thousand dollars worth of improvements. (Souders Aff. 5–18–98 ¶ 2.) The condition of the premises at that time included a need for handicap accessibility. When the Zierers sold it, the entrance, bar area, bathrooms and telephones were not handicap accessible, and there was no designated handicap parking with curb cuts. (Ritter Test; Gialias Test.)

The front of the building has four doors, although the center door was and continues to be used as the main entrance door. (P–2, –3, –18 to –20; Gialias Test.; Williams Test.) There are approximately 14 parking spaces directly in front of the building, which are owned by the town and are located in the public thoroughfare. Additional parking is located down a path to the side of the building, and across the street. (*Id.*)

### B.  The Parties and Attorneys

Plaintiff Bennett Ritter ("Ritter") is a former Marine, confined to a wheelchair since 1988 as a paraplegic. He is a member of the Paralyzed Veterans of America. He is a licensed real estate broker, and his office is located directly across the street from Clinton House. Both before and after he became disabled he went to that restaurant, sometimes taking clients to lunch there. He was familiar with the restaurant under the Zierers, and under the new management after the Zierers sold in late 1995. He moved to Florida in June, 1997 (after this case was filed in July, 1996), and currently resides there. (Ritter Test.)

Attorney Anthony J. Brady, Jr. ("Brady") was admitted to the New Jersey bar in 1984. He is also admitted in Pennsylvania, South Carolina and Florida. He is a sole practitioner in Maple Shade, New Jersey, in shared office space adjacent to an organization named Advocates for Disabled Americans ("AFDA"). William Caruso, a disabled veteran who is not an attorney, manages the AFDA office. Brady uses the AFDA fax machine for his law practice. Brady and Caruso have filed approximately forty ADA cases together, with Caruso and AFDA as the plaintiffs and Brady as the attorney. One of those

---

**5.** The deed shows the record owners of the real property to be Pandelis Gialias and Mary Ann Gialias, Peter A. Giacoumopoulos, and Nick A. Giacoumopoulos. (D–11, deed dated 10–30–95.) Counsel for defendant has certified that Nick Giacoumopoulos does not have an ownership interest in the real property or in the restaurant. (Souders Aff. 5–18–98 ¶ 8.)

We need not resolve that discrepancy in deciding the present motions. The restaurant and business premises have reportedly been owned and operated by a New Jersey Limited Liability Company named "Sidirounda, L.L.C." since the date of acquisition, October 30, 1995. (*Id.* ¶ 7.)

was the high-profile case of *Caruso v. Blockbuster–Sony Music Entertainment Centre*, 174 F.3d 166 (3d Cir.1999), holding that a music pavilion violated ADA new construction requirements by failing to provide wheelchair access to the lawn seating area. Brady practices in the field of civil rights for the disabled. His practice is approximately 80–90% disability-related. His case filings include a pending action against Disney World in Florida. (Brady Test.)

Ritter met Brady at the Abilities Expo in Edison in April, 1995. That is an annual exhibition at which vendors show medical equipment for disabilities. Brady had a booth there as the Advocates for Disabled Americans. Ritter and Brady conversed, and Brady gave Ritter his business card. Ritter later contacted Brady to get his assistance with Clinton House, and the present case was filed. (Ritter Test.)

Defendant, "The Clinton House Restaurant," does not exist as a legal entity. (Answer; Souders Aff. 5–18–98 ¶ 2.) The restaurant is owned and managed as described *supra*, note 5. Pandelis "Pete" Gialias ("Gialias") testified on behalf of defendant at the hearing. He is one of the owners of the restaurant and conducts the day-to-day operations of the business. He and his co-owners had no connection with the restaurant before purchasing it in October, 1995. He is the chef, and also manages the business aspects. His wife Mary Ann does the "paperwork" but is not otherwise involved. Peter Giacoumopoulos is not involved in the management of the business. Gialias works approximately 90 hours per week at the restaurant, and has done so since they acquired it. (Gialias Test.) He speaks with a strong Greek accent.

Attorney Donald E. Souders, Jr. ("Souders") was admitted to the New Jersey bar in 1991. He also is a sole practitioner, maintaining his office in Phillipsburg. He represented Gialias and his co-owners in

the acquisition of the Clinton House real estate and business assets. When the instant suit was filed, he undertook the representation as defense counsel. (Souders Aff. 3–23–98 ¶¶ 1, 9.)

### C. *The Sequence of Events*

We must begin with a chronological history of the litigation. Additional pertinent facts are set forth in the Discussion, *infra.* See *Metropolitan Pittsburgh Crusade for Voters v. Pittsburgh*, 964 F.2d 244, 245 (3d Cir.1992) ("In deciding who is a prevailing party when extrajudicial relief renders legal claims moot, courts look to the chronology of events leading to resolution of the dispute."); *Dunn v. United States*, 842 F.2d 1420, 1422 (3d Cir.1988) ("[T]his appeal presents challenges to the fee award that are inextricably linked with the history of the litigation. We will therefore set forth in some detail the course of the relevant underlying litigation and the results it is said to have achieved.").

The Clinton House was acquired by the present owners ("the owners") at the end of October, 1995. They immediately commenced a major redesign and renovation of the entire restaurant portion of the building, which occupies the first floor.[6] (Salamone Test.) The restaurant was closed to the public for a brief period during the early construction work, and resumed operations in early 1996, while the work was still in progress. (Ritter Test.; Gialias Test.)

Ritter had dined at Clinton House frequently when it was under the prior ownership, and had complained to the Zierers about its lack of handicap accessibility. They made no modifications before selling it. Ritter went there for lunch several times after it reopened under the new owners, during the period from approximately January through June, 1996. He observed that the newly-constructed bathrooms and bar/dining room areas, including the telephone height, had been made

---

6. The upper floors are not relevant to the present issues, and no evidence was taken

regarding those portions of the premises.

handicapped-accessible ("accessible") as the renovations progressed. He further observed, however, that the entrance to the restaurant had not yet been modified with a ramp and door modifications to make it accessible, and that there was inadequate disabled parking. Ritter, himself a realtor, went to the office of the Building Inspector in March, 1996, and looked at the construction plans then on file. He saw no plans submitted for any exterior modifications. Having met Brady previously, as described above, he contacted Brady about the situation. (Ritter Test.)

Brady states that he first visited the site on June 15, 1996, when Ritter, Brady, and a friend who also needed a wheelchair had dinner together at Clinton House. At that time Brady personally observed that there was no ramp in place. (Brady Test.) Brady certifies that on June 27, 1996, he went to the office of the Building Inspector and reviewed the plans then on file, finding no drawings of a ramp. (P–16; Brady Certif. (undated) attached to Pl.'s Main Br.) The Complaint in this case was received by the Clerk on June 25, 1996, and was entered on the docket as filed on July 1, 1996. (Docket entry 6–25–96.) At no time before filing suit did Brady communicate orally or

in writing with the owners of Clinton House to make any inquiries or demands on behalf of Ritter.[7] Nor did Brady inspect the deed or other public documents to determine the identity of the owners of the property or the operators of the restaurant. (Brady Test.)

The arrangement by which Ritter retained Brady to file suit on his behalf was oral. (Brady Test.; Ritter Test.) Ritter did request to see the Complaint before it was filed.[8] Brady paid the filing fee of $120, and all subsequent disbursements in the case. (Brady Test.) Ritter at no time incurred any expense in connection with the case, until he traveled from Florida to testify at the evidentiary hearing which we convened to address the attorneys' fee issues. (Ritter Test.) No writing setting forth the terms of the retainer existed until April, 1998, after plaintiff's motion for attorneys' fees had been denied without prejudice and this Court had ordered the evidentiary hearing. (*Id.;* D–1, Ritter Certif. 4–25–98.)[9] Ritter at no time was asked by Brady to authorize the hiring of an expert witness or per diem attorney, until the evidentiary hearing was ordered. Ritter had no understanding as to how such persons would be paid, except that Brady would be paying them, under terms

7. Ritter testified that in February, 1996, he caused a letter to be sent by the Eastern Paralyzed Veterans Association by registered mail to Mr. and Mrs. Gialias at both their home address and at Clinton House. (Ritter Test.) That letter encouraged the owners to comply with ADA and remove barriers to accessibility, referring to the bathrooms, parking and entrance. The letter did not mention Mr. Ritter or any other individuals, and did not make any demands or threats of suit. (P–1.) At the hearing the only return receipt for the letter in evidence was the receipt for the Gialias' home address, signed by their son, Nick. (*Id.* at 3.) Gialias testified that he never saw the letter. (Gialias Test.) In any event, Brady was not involved in that letter because it was sent before Ritter contacted Brady to represent him. (Ritter Test.)

8. In a letter Ritter asked to see a copy of the Complaint in advance of filing, stating:
   If you don't mind, please fax me a copy of what it is that you are going to file. Since

my name is going to be on this thing, I'd like to have the opportunity to see it in advance.
(Ltr. from Ritter to Brady 6–13–96, attached to Pl.'s Main Br.)

9. Ritter's sworn certification of April 25, 1998, in addressing the attorney-client arrangement with Brady, states in full (verbatim) as follows:

   I retained my attorney, Anthony Brady at $200 per hour on the contingency that he would be paid if my suit is successful, pursuant to the fee shifting provisions of the ADA; i.e., my attorney's fees to be paid by the defendant.
   *Id.* Ritter testified at the hearing that at the time he retained Brady to file this suit, he was not aware of the fee-shifting provisions of the ADA. He testified that he first learned of that in April, 1998 when he signed this certification.

unknown to Ritter.[10] No bills for fees or disbursements were ever sent by Brady to Ritter. Brady did orally indicate to Ritter that when the case was terminated, Brady would get his fees as the result of successful completion of the case, and that Ritter should win the case.[11] No copies of any letters exchanged between counsel were provided by Brady to Ritter subsequent to the filing of the Complaint, although they discussed the case periodically by telephone. (Ritter Test.)

The Complaint, as previously noted, named as the sole defendant "The Clinton House Restaurant." The factual averments of the Complaint are set forth in full in the margin.[12] Specifically, the Complaint alleged that "there is no disabled parking; there is a step into the restau-rant; the height of the telephone is illegal and there is a lack of bathroom facilities." (Compl.¶ 5.) The Complaint sought (1) a declaration "that the defendant is in violation of the civil rights laws;" (2) an injunction "ordering the defendant to comply with the ADA, the New Jersey Law Against Discrimination and the New Jersey Barrier Free Code;" (3) damages; and (4) attorneys' fees and costs of suit. (*Id.* at 2.)

Ritter testified at the hearing that at the time the complaint was filed, to his recollection the remodeled public interior was already fully accessible, including the bathrooms and telephones. Brady testified at the hearing that the intended focus of the lawsuit was on the exterior—the ramp and the parking spaces—and not the interior.

---

10. Brady appeared at the evidentiary hearing with Pasquale Picariello, Esq., who proceeded to represent plaintiff throughout the hearing. Ritter testified that he was aware of that per diem relationship, but that he was not informed of how Mr. Picariello was to be paid except that Brady would arrange for his payment. (Ritter Test.) Those fees and the fees of two other per diem attorneys are included in Brady's fee application.

11. The Rules of Professional Conduct as adopted by the New Jersey Supreme Court govern the conduct of members of the bar admitted to practice before this Court. Local Civ. R. 103.1(a). Relevant portions of those Rules provide as follows:

1.5 **Fees**

.     .     .     .     .

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated in writing to the client before or within a reasonable time after commencing the representation.

(c).... A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined....

1.8 **Conflict of Interest: Prohibited Transactions**

.     .     .     .     .

(e) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter;....

Rules of Professional Conduct 1.5(b)-(c), 1.8(e)(1).

12. The Complaint states verbatim as follows:

4. This is a proceeding for a declaration that the defendant operates a business that discriminates against the disabled, for a permanent injunction enjoining the defendants from continuing to operate a business that discriminates against the disabled and ordering structural changes to make defendants facility in compliance with the Americans with Disabilities Act as well as the applicable New Jersey law.

5. For a large number of years the plaintiff has attempted to eat at defendants restaurant. On June 4, 1996 the plaintiff ate at the restaurant. The plaintiff has been angered to find that defendants restaurant was not accessible to the disabled. Specifically, there is no disabled parking; there is a step into the restaurant; the height of the telephone is illegal and there is a lack of bathroom facilities.

6. Upon information and belief said restaurant will make alliterations during 1996. Said alliterations illegality do not make the facility accessible to the disabled.

7. Said architectural barriers cause discrimination against the disabled. As a result plaintiff was discriminated against based on his disability because defendant should have been in full compliance the ADA, the NEW JERSEY LAW Against Discrimination and the New Jersey Barrier Free Code.

8. As a result the Plaintiff suffered mental distress, anger and anxiety:

WHEREFORE....

(Compl.¶¶ 4–8) (errors in the original.)

Issue was joined with the filing of the Answer on August 2, 1996 asserting, *inter alia*, that plaintiff had sued a nonexistent entity and that the Complaint was filed in violation of Rule 11.

The first scheduling order was issued on August 7, 1996, directing counsel for the parties to meet with each other pursuant to Fed.R.Civ.P. 26(f), and to appear before the Magistrate Judge at the initial scheduling conference on October 8, 1996. Souders, counsel for defendant, directed a letter to Brady dated August 20, 1996 in which he stated that the owners had just recently purchased the property and were in the process of extensive renovations which would render it in total compliance with ADA and state requirements. He said that the architect, Louis Salamone, had advised that the property would be in total compliance within the next sixty days, and requested that plaintiff dismiss the Complaint without prejudice since his client was acting voluntarily in making the structural improvements. He closed by requesting a response from Brady in light of the fact that if plaintiff declined, the attorneys were obliged to schedule and conduct their Rule 26(f) meeting prior to the court date of October 8, 1996.[13] (P–9.) Souders received no response. On October 4, 1996, with the court scheduling conference then four days away, Souders sent a fax to Brady requesting a reply. By letter dated October 6, 1996, Brady expressed that he found Souders' request that the case be dismissed without prejudice to be "laughable," and stated that "plaintiff will not dismiss his complaint without a verification that the restaurant will comply, damages[,] attorney fees and cost of suit." [14] (D–8.) On October 8, 1996,

13. Both the tone and the content of some of the correspondence exchanged between counsel bears directly upon the issues presented in these motions. We believe it is necessary to quote material portions of that correspondence, which we have set forth in the footnotes so as not to unduly burden the text of the opinion.

The Souders letter to Brady dated August 20, 1996 stated in full:

As you know, I represent the Plaintiff [sic] in the above-captioned matter. Please note that my client just recently purchased the subject restaurant and has, since the commencement of its ownership, expended tens of thousands of dollars towards renovations, many of which are being completed as this letter is written. My client purchased the Clinton House in an "AS IS" state and, realizing it was in need of structural and aesthetic improvements, immediately commenced with the process of making it more "customer friendly." This includes total compliance with the A.D.A., N.J.L.A.D., and the N.J. Barrier Free Code.

Please be advised that I have confirmed with my client's architect, Mr. Louis Salamone of Design Services in Riverdale, New Jersey, that, within the next **sixty (60) days**, the Clinton House with [sic] be in *total compliance* with the above-referenced statutes. Accordingly, since my client has voluntarily undertaken the task of doing that which your client is seeking by way of a Judgment in Federal Court, I would respectfully request your client to dismiss his Complaint. In the event the within representations prove to be made in error, your client may, sixty (60) days from now, re-file his lawsuit. However, there is absolutely no need to continue at this juncture, other than to exact some sort of malicious retaliation upon my client—who had nothing at all to do with the underlying problems (to the extent there are any).

In closing, I note that this letter is submitted in the utmost of good faith and strictly in furtherance of settlement.

Kindly advise accordingly regarding your client's position in this matter as soon as possible. If a dismissal is not possible, we need to schedule a meeting of the parties, as per the Court's Order dated August 7, 1996.

Thank you.

(P–9 (emphasis in original).)

14. Brady's letter of October 6, 1996 is quoted verbatim as follows:

I thank you for your fax dated October 4, 1996. Upon receipt I reviewed my file which contained your letter dated August 20, 1996, which must have been filed while I was away in Georgia on business.

My client is pleased that the defendant finally agreed to obey the law. It is unfortunate that it took Mr. Gialias over six years to understand his obligations. See attached article. I would recommend that any plans be submitted to us to determine whether they are adequate in accordance with the codes.

Souders made initial Rule 26(a) disclosures by letter to Brady. Those disclosures included the names of Pandelis Gialias and others as the owners/operators having discoverable information; identification of the deed as a relevant document already produced to plaintiff; and identification of Mr. Salamone as a potential expert witness.[15] (D–10.) There is no record of any reciprocal Rule 26 disclosures by Brady to Souders at any time, with the exception of an expert report by Mr. Williams (discussed *infra*) which was later produced.

As previously noted, the October 8, 1996 initial scheduling conference was the only occasion when counsel for the parties appeared in court on this case throughout the discovery and pretrial period. Brady and Souders each attended that conference, which was conducted by the Magistrate Judge. It resulted in a series of scheduling orders and telephone status conferences with the Magistrate Judge periodically during 1996 and 1997. (Docket entries.)

Shortly after the initial court conference, on October 28, 1996, Souders wrote to Brady enclosing a set of his client's renovation plans, consisting of three blueprint-style documents. (P–37; P–6 to –8; Brady Test.) The "Demolition Plan" for the initial interior phase, dated January 22, 1996, contained no detail pertaining to the exterior. (P–6.) The other two drawings were both entitled "First Floor Plan" and were dated August 27, 1996 and October 14, 1996, respectively. Both of those "First Floor Plan" drawings depicted the installation of a series of three poured concrete ramps, with railings where indicated, to provide wheelchair accessibility to the main entrance.[16] Both drawings also contained instructions nearby the ramp area stating: "Provide curb cut from parking area adjacent to ramp." (P–7, –8.) The August 27 drawing also contained detailed specifications for the dimensions of the ramp and the railing, as well as for the dimensions of the main entrance door and door frame. (P–7.)

Brady made no response upon receipt of those documents. Brady also did not at any time reveal those two floor plan drawings to his expert, Mr. Williams, who was engaged approximately a year later to inspect the exterior of the building and render a report. He did, however, show Williams the demolition plan (P–6), which contained no exterior detail. (Williams Test.)

When Mr. Williams was shown those floor plan drawings during cross-examination at the evidentiary hearing on December 4, 1998, he testified that he had never seen them before. After examining them, he stated that in his opinion those drawings represented an adequate removal of the barriers in the entrance and the front, although they did not contain details such as the hardware on the door or the actual front elevation of the new poured concrete entrance. Also he noted that those draw-

> My client finds that your demand that he dismiss his suit laughable. First, your client on numerous occasions his ignored my client's requests that he obey the law. Secondly your client in his alterations made substantial alterations with a complete disregard of the ADA. It is defendant's position that he did not have knowledge of the code then I recommend suit against Desidn Services his architect and against any attorneys he retained when he appeared before the Clinton planning board. Third, as a result of your answer I have had to conduct substantial legal research.
>
> As a result the plaintiff will not dismiss his complaint without a verification that the restaurant will comply, damages attorney fees and cost of suit.

> I thank you for your attention and look forward to your response.
> (D–8.)

**15.** Defendant's Rule 26 disclosures on October 8, 1996 identified the four individuals listed *supra*, n. 5, as the owners and operators of Clinton House. It appears that the limited liability company, Sidirounda L.L.C., was not identified until plaintiff moved to add the individual defendants in 1998. By letter dated October 10, 1996, Brady expressed his awareness that he needed to amend the complaint to name the proper parties as owners. (D–12.)

**16.** For ease of reference, we will refer to the ramps as "the ramp."

ings did not extend to show the parking area. (*Id.*)

The record reflects no further correspondence or discovery between the parties during the period from October, 1996 until May, 1997. Also, there is no record of any conversations between counsel during that period except in the course of the court-initiated telephone conferences on October 30, 1996, February 14, 1997 and April 16, 1997. (P–16 (Brady time records); Souders Certif. 5–25–99, Ex. A (Souders time records); docket entries.) During that period the design and construction work relating to the renovation of Clinton House was ongoing. (Gialias Test.; Salamone Test.; P–30 (Ltr. 3–20–97 from Salamone to Construction Official on various topics including ramp design).)

On May 2, 1997, referring to the April 16, 1997 telephone conference with the Magistrate Judge, Brady directed a letter to Souders outlining a settlement demand. The proposal was that defendant would construct a permanent ramp when approved by the township; a temporary ramp would be installed in the meanwhile; and defendant would pay $2,165 in attorneys' fees and costs. (P–38; Brady Test.) Souders responded in writing on May 5, 1997, advising that the owners would agree to commence construction of a permanent ramp within thirty days, and if construction did not commence within that period they would place a temporary ramp at the entrance. The demand for a monetary settlement was rejected.[17] (D–3.) Brady made no response.

Defendant then scheduled the deposition of plaintiff, which was conducted on May 27, 1997. Plaintiff was accompanied to his deposition by a per diem attorney, Warren E. Smith, Esq. (Dep.Tr.5–27–97.) It will be recalled that plaintiff moved to Florida in early June, 1997. (Ritter Test.) Brady at no time deposed any representative of defendant. On July 27, 1997 Brady went to the office of the Clinton Construction Official and looked at the Clinton House file. There he saw a letter from Mr. Salamone to that office dated March 20, 1997 discussing, *inter alia,* the design of the ramp. (P–30; Brady Test.) He wrote to Souders on July 31, 1997, stating that it had come to his attention that the owners were intending to install a ramp on the side of Clinton House, and that he would not object to such a ramp but that "the plaintiff will require that the front entrance be made accessible." (P–36.)

On August 19, 1997, Brady faxed to Souders an expert report prepared by Mr. Williams and dated August 15, 1997. (Pl.'s Main Br., attach. 10.) That same day, Souders wrote to Magistrate Judge Wolfson objecting to the naming of an expert and the production of an expert report when, according to the latest scheduling order, the time for discovery had expired on June 30, 1997 and the Pretrial Conference was scheduled for September 17, 1997. (Chambers file.) That letter requested an extension of the discovery period so that defendant could retain an expert. The Court responded by telephone conference on September 3, 1997, extending discovery time to November 30, 1997, and adjourning the previously-scheduled Pretrial Conference until December 17, 1997.[18] The Pretrial Conference was later

---

**17.** In that exchange of correspondence the parties expressed their factual dispute, which this Court has now been called upon to resolve. Brady stated:

Mr. Gialias representation that he fully intended to comply with the ADA prior to plaintiffs' suit is simply not true. Mr. Gialias's first contractor informed the plaintiff that Mr. Gialias had no such plans. Additionally, the defendant failed to submit any such plans until well after the suit was filed. (P–38.) Souders replied:

Your client's request for a monetary settlement is unacceptable and is hereby reject-

ed. My clients disagree with the statements set forth in the fifth (5th) paragraph of your May 2nd letter [quoted above] and most certainly will not agree to include any such language in a settlement agreement or consent order.

(D–3.)

**18.** Also on September 3, 1997, the day that the discovery time was extended by the Magistrate Judge to November 30, 1997, Brady sent to Souders interrogatories consisting of nine questions. Those were never answered,

rescheduled by the Court, resulting in the date for the Pretrial Conference being reset for January 28, 1998. (Docket entries.)

Souders wrote to Brady on September 8, 1997, providing him with a copy of the survey of the property and suggesting a meeting of Souders, Brady, Williams, Gialias and his architect, preferably at Clinton House. The purpose of the suggested meeting was for them all to discuss the placement and construction of the ramp and attempt to resolve that issue. (P–11.) Brady wrote to Souders on September 12, 1997 requesting to depose Gialias. Souders replied by letter on September 24, 1997, saying that he would check on Gialias' availability for a deposition in late October or November, and requesting a response to his suggestion for a meeting at Clinton House. (D–19.) Thereafter, a meeting was scheduled for November 4, 1997, which was canceled by Brady. (Souders Aff. 3–23–98 ¶ 20.) Souders again wrote to Brady on November 19, 1997 seeking to reschedule the meeting, which was then scheduled for December 16, 1997. On that day, the owners and their current architect, Susan Rochelle, assembled at Clinton House for the meeting, having worked to prepare for it. Brady and his expert failed to appear. Brady had faxed a note to Souders's office at approximately 6:30 p.m. the previous night, canceling the meeting. No other notice had been given. (D–20; Souders Aff. 3–23–98 ¶ 21–22.)

Souders again wrote to Brady on January 4, 1998, referring to Brady's cancellation of the December 16 meeting and stating that if Brady wished to schedule any meeting relating to construction plans, he would have to take the lead. With that letter Souders also gave formal notice that architect Rochelle would be defendant's expert at trial, and forwarded Rochelle's plan for the ramp and disabled parking access. Finally, in that letter Souders solicited plaintiff's comments or objections in writing, and suggested that if there were none, the court could be advised that no trial would be necessary and that the attorneys' fee issue could be submitted on affidavits. (D–21.) Brady did not respond. Souders also sent Brady the expert report of Ms. Rochelle, by letter dated January 15, 1998. (P–26.)

The Pretrial Conference was set for January 28, 1998, and the parties' pretrial memoranda were due in advance of the conference. On January 22, 1998, Souders received by fax a letter on the stationary of Brady's law office and signed by one David J. Palmer, Esq., a per diem attorney. (D–15.) Souders responded by letter dated January 23, 1998, sent by both fax and regular mail. (D–4.) Palmer faxed back a response the same day. (D–14.) The content of those three letters is set forth in the margin.[19] Also that same day,

---

and Brady did not pursue the matter by motion or otherwise.

**19.** The initial letter of this exchange was from Mr. Palmer, stating:

On January 22, 1998, I spoke with Mr. Brady in regard to settlement of this matter. Mr. Brady indicates to me that if the defendants are agreeing to putting the handicapped parking and the ramp in conformity with the proper regulations and in conformity with what your expert indicates on her plans will be done, Mr. Brady will agree to settle the matter. This means that the only other issue in dispute is the matter of attorney fees. If you wish to have a conference on attorney fees, Mr. Brady is amenable to that, otherwise, he will simply do his Motion on attorneys fees.

Settlement as to the equitable relief sought ought do away with the necessity of having a Pre-Trial conference with Judge Wolfson.

If you are in agreement with this, kindly call me and let me know. Also, if you have any questions or need any clarification, please do not hesitate to contact me.

I thank you for your kind attention to this matter and look forward to your response. (D–15.) Souders replied:

I hereby acknowledge receipt of your letter dated January 23, 1998 but faxed to my office the day before, to wit, on January 22, 1998.

It appears as if Mr. Brady is agreeing with the proposal set forth in my most recent letter. Specifically, that my client has either made all the requisite improvements or is in the process of doing same. More specifically, the sole remaining issue relates to the entrance ramp which we have agreed to complete. Hence, the only legal

after receiving a reply from Souders, Mr. Palmer wrote to Magistrate Judge Wolfson advising that the matter was settled except for the issue of attorneys' fees, and requesting that the Pretrial Conference be canceled. (P–28.) Brady acknowledged in his testimony that he never submitted a pretrial memorandum to the Court, and that the impending pretrial memo and Pretrial Conference (with trial to follow) caused an increase in his office's efforts to settle, because it would have been easier to settle than to prepare the pretrial memo and try the case. The cross-motions for attorneys' fees followed.

Ritter testified on December 4, 1998 at the evidentiary hearing on these motions. He stated that after he moved to Florida in June, 1997 he retained his New Jersey realtors license, but had only returned to Clinton two or three times, spending most of his time in Florida. When he had most recently been to Clinton, in July, 1998, there was still no ramp and no handicap parking. Plaintiff's expert, Mr. Williams, testified at the hearing on February 25, 1999 that based upon photos stipulated into evidence as having been taking in January, 1999, the construction of the concrete ramp and the handicap parking access appeared to be complete and compliant, with the exception that there was a temporary rail alongside the ramp. (P–18 through –25; Williams Test.) Gialias testified at the continuation of the hearing on May 20, 1999 that the custom-built permanent railing had by that time been delivered and installed.

It was the testimony of Mr. Ritter that when he traveled to New Jersey to participate in the evidentiary hearing, he thought he was coming to testify at the trial in the matter involving the ramp at Clinton House. It was his expectation that as a result of the "trial" he would get compensation for his travel to New Jersey to testify; his attorney would get his fees; and that the owners of Clinton House would be "found guilty" of not complying with ADA and would have to pay those fees. Ritter indicated no expectation of obtaining damages.[20] (Ritter Test.) He

issue which remains is that of whether or not my client should be obligated to pay plaintiff's attorney's fees.

In regard to the attorney's fee issue, I suggest that it be presented to the Court by way of Motion (as I previously suggested). However, prior thereto, I would appreciate your providing me with a summary of the time expended in this matter by your office. From my perspective, it appears as if very little time was expended (Mr. Brady only attended 1 conference with Magistrate Woolfson [sic] in Trenton and even sent a per diem attorney to the plaintiff's deposition).

In any event, you should probably inform Magistrate Woolfson that we have resolved this matter, except for the attorney fee issue.

(D–4.) Palmer replied:

I hereby acknowledge receipt of your faxed letter dated January 23, 1998. Please forgive me and the secretary for not being perfect.

What Mr. Brady is agreeing to are the modifications as indicated by Susan Rochelle's preliminary plans, as she indicates that the work will be done in the manner required by the New Jersey Barrier Free Code at 28 C.F.R. part 36. Therefore, Mr.

Brady indicates to me that he is satisfied that we have reached a settlement as to the equitable relief sought in this matter. This leaves only the issue of attorneys fees, which will be settled by way of Motion filed by Mr. Brady when he returns from his honeymoon. If you have questions or comments please do not hesitate to contact me.

Finally, I ask that you either call or fax to me your response to this letter so that I may know whether I should call or write the Judge that a settlement has been reached as to the equitable relief. This will then negate the necessity of a pretrial conference and hopefully the remainder of the case can be resolved quickly.

(D–14.)

20. Brady testified that Ritter authorized him to drop the damages claim, and that he so informed the Magistrate Judge and Souders during one of the telephone scheduling conferences, he believed during 1996. He stated that he reached that understanding with his client verbally, and did not confirm it in writing. He further testified that at the time the settlement was arranged in January, 1998, he had obtained prior approval from his client to negotiate a settlement and approve attorneys' fees and costs.

testified that he was not made aware of the contents of Souders's letter of May 5, 1997 making a settlement offer (D–3); nor the settlement offer communicated by Mr. Palmer referred to in Souders's letter of January 23, 1998(D–4). He never heard of David Palmer and had never discussed anything about the case with him. According to Ritter's testimony, he never had a conversation with Brady in which Brady indicated that he would be willing to settle for attorneys' fees of approximately $2,500. In fact, Ritter was never advised by Brady that the case was settled, and he was not aware of any agreement obligating defendant to bring the property into compliance. (Ritter Test.) It is undisputed that defendant has at no time offered or agreed to pay attorneys' fees or costs of suit to plaintiff, and that defendant opposes the grant of such relief on the ground that plaintiff is not the prevailing party. (Brady Test.; Gialias Test.)

### III. *DISCUSSION*

#### A. *Plaintiff's Motion for Attorneys' Fees under ADA*

Plaintiff's motion filed in February, 1997 sought a total of $10,231.52 in attorneys' fees and costs. (Pl.'s Main Br., Attachment 15.) That figure rose to a total of approximately $28,152.43 at the conclusion of the hearing proceedings.[21] (P16, – 16A, –27, –31, –32, –34; Brady Certif. (undated) filed 6–9–99.)

The ADA states that "[i]n any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs . . . ." 42 U.S.C. § 12205. Therefore, in determining whether fees should be awarded, we must first decide whether the plaintiff pre-

vailed within the meaning of the statute. *Farrar v. Hobby,* 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). If that determination is in the affirmative, we must then consider any circumstances which would render the award of fees unjust. Finally, if we conclude that plaintiff is entitled to some award, we must examine the reasonableness of the amount requested. *Id.* at 115, 113 S.Ct. 566. We make these determinations in light of the statutory purpose of ADA as a remedial statute, which should be broadly construed to effectuate its purpose of eliminating discrimination against the disabled in our society. *Kinney v. Yerusalim,* 812 F.Supp. 547, 551 (E.D.Pa.), *aff'd* 9 F.3d 1067 (3d Cir.1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994).

The Third Circuit has not had occasion to identify the standard for determining who is a prevailing party under the ADA. It is clear, however, that the test is to be derived from jurisprudence under 42 U.S.C. § 1988. *See Disabled In Action of Pa. v. Pierce,* 789 F.2d 1016, 1018–19 (3d Cir.1986) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)) (holding that standards used in section 1988 cases are applicable to determine "prevailing party" under section 505(b) of the Rehabilitation Act of 1973). The legislative history of the ADA reflects that Congress intended § 12205 to " 'be interpreted in a manner consistent with the Civil Rights Attorney's Fees Act,' 42 U.S.C. § 1988 (" § 1988"), 'including that statute's definition of prevailing party, as construed by the Supreme Court.' " *Webb v. James,* 967 F.Supp. 320, 322 (N.D.Ill. 1997) (quoting H.R. REP. No. 101–485, 101st Cong., 2d Sess., pt. 3, at 73 (1990), U.S.Code Cong. & Admin.News 1990, p. 303). 42 U.S.C. § 1988 provides in pertinent part:

---

**21.** The above total is our best effort at deciphering plaintiff's documentation of claimed fees and expenses. The documentation provided by plaintiff on the original motion, as well as the supplemental materials submitted in connection with the hearing proceedings, falls woefully short of the requirements of Local Civil Rule 54.2. We will refrain from addressing the reasonableness of any amounts claimed by plaintiff, in view of our disposition of this motion.

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b). Thus, by its terms, Section 1988 requires that the plaintiff be a "prevailing party" to recover attorneys' fees. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. The party claiming prevailing party status bears the burden of proof. *Cf. Dunn v. United States*, 842 F.2d 1420, 1432–33 (3d Cir.1988) (discussing standard under similar provision of Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)).

█ The test to determine prevailing party status is well established in this Circuit. In *Disabled in Action*, 789 F.2d at 1019, our Court of Appeals said that the test "is whether the fee petitioner achieved some of the benefit sought by the party bringing the suit." The test, which is essentially a two-part inquiry, requires a court to determine whether: (1) the plaintiff achieved some of the benefit sought by the lawsuit; and (2) "the litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.'" *Metropolitan Pittsburgh Crusade for Voters v. Pittsburgh*, 964 F.2d 244, 250 (3d Cir.1992) (quoting *Dunn*, 842 F.2d at 1433). Plaintiff argues that this case meets both prongs of the statutory criteria because the objectives of the lawsuit were achieved, and because causation is demonstrated by the fact that a settlement was reached with respect to the design and construction of the ramp and the handicapped parking. We must analyze each of those contentions to determine whether plaintiff qualifies as a prevailing party.

█ In determining whether a party has met the first prong of the prevailing party test, a court should compare the relief plaintiff sought from the lawsuit with the relief eventually obtained. *Hughes v. Lipscher*, 852 F.Supp. 293, 301–02 (D.N.J. 1994) (citing *Institutionalized Juveniles v.*

*Secretary of Public Welfare*, 758 F.2d 897, 911 (3d Cir.1985)). "Plaintiffs will be prevailing parties even though the relief they obtained is not identical to the relief they specifically demanded, as long as the relief obtained is of the same general type." *Institutionalized Juveniles*, 758 F.2d at 912. It is well settled that relief need not be judicially decreed to justify a fee award. *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987). Finally, "a plaintiff is a prevailing party to the extent extrajudicial relief makes legal claims moot." *Metropolitan Pittsburgh Crusade*, 964 F.2d at 250 (quoting *Institutionalized Juveniles*, 758 F.2d at 911).

The first prong requires little discussion in this case. The Complaint (and the First Amended Complaint which made identical claims) alleged four areas of ADA violations: (1) telephone height; (2) bathrooms; (3) entrance; and (4) parking. The undisputed evidence showed that at the time the action was filed in July, 1996, there was no issue concerning the telephone height and bathrooms, because those aspects of the interior improvements had already been completed, without any input from plaintiff. Therefore, there was not and could not have been any relief obtained in the lawsuit with respect to the telephones and bathrooms.

█ Plaintiff's pleadings sought relief in several forms: (1) declaratory judgment of statutory violation; (2) injunction requiring plaintiff to comply with ADA, NJLAD and the New Jersey Barrier Free Code; (3) damages; and (4) attorneys' fees and costs of suit. (Compl.; First Amended Compl.) It is uncontroverted that no declaratory judgment, injunction or damages were obtained in this case, and that the issue of attorneys' fees is still before the Court. Therefore, if plaintiff is to be shown to have achieved any of the objectives of the lawsuit, it could only be as to the entrance and parking, and it could only be as to the undertakings which were agreed to in the exchange of letters between the parties on January 23, 1997.

We find that with respect to those undertakings some of the objectives of the lawsuit were accomplished, and accordingly the first prong has been met.

The second prong of the prevailing party inquiry focuses on causation. In order to establish this element, plaintiff must demonstrate that "the litigation constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief." *Metropolitan Pittsburgh Crusade*, 964 F.2d at 250 (quoting *Dunn*, 842 F.2d at 1433). While there must be some causal relationship between the lawsuit and the relief obtained, "the plaintiff's lawsuit need not be the sole cause of defendant's action." *Id.* Further, the district court must apply the most expansive definition of causation. *Hughes*, 852 F.Supp. at 304 (citing *Dunn*, 842 F.2d at 1433).

Causation may be established by obtaining a "judgment, consent decree or a settlement that 'change[s] the legal relations of the parties such that defendants are legally compelled to grant relief.'" *Baumgartner v. Harrisburg Hous. Auth.*, 21 F.3d 541, 546 (3d Cir.1994) (quoting *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 132 (3d Cir.1991)). Alternatively, plaintiff may establish causation through a "catalyst theory," where "even though the litigation did not result in a favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief." *Id.* at 546 (quoting *Wheeler*, 950 F.2d at 132). The classic situation for application of the catalyst theory is where the defendants voluntarily change their behavior to eliminate the challenged conduct. *Id.* (citation omitted).

Here, the parties settled the case before any trial was conducted, and no judgment was obtained. Thus, plaintiff cannot show that a favorable judgment was the cause of the relief obtained. Rather, plaintiff must rely on the catalyst theory to show causation. In order to demonstrate that he is a prevailing party under this theory, plaintiff must "prove that the existence of the lawsuit accomplished the original objectives of the lawsuit." *Baumgartner*, 21 F.3d at 544; *see also Craig v. Gregg County*, 988 F.2d 18, 21 (5th Cir.1993) (finding that plaintiff "has not shown that his suit caused Gregg County to remedy the allegedly flawed voting scheme").

Plaintiff argues that he is a prevailing party because the original plans for the renovation, dated January 22, 1996, did not include any plans for a ramp or disabled parking spaces in front of the building. (Pl.'s Main Br. at II.) He points to the fact that at the time the lawsuit was filed that work had not been undertaken, and that the construction permit for the ramp was not issued until March, 1998, after the case was settled. (Pl.'s Reply Br. at II; P-39.) Plaintiff further contends that even if defendant can demonstrate that it had plans to install a ramp and provide accessible parking before the lawsuit was filed, plaintiff is the prevailing party for the following reasons: (1) it took defendant approximately two and a half years from the date of acquisition to accomplish those modifications; (2) defendant made representations at various points in the litigation that it would be done in 30 or 60 days and it was not; (3) a temporary ramp could have been installed, but was not; and (4) disabled parking could have been provided by merely painting a space and placing a sign, but it was not.[22] (Brady Test.)

22. Plaintiff further argues that the work was required to be done in 1992 when ADA became effective. (Brady Test.) This argument is clearly specious because Clinton House was not acquired by the present owners until October of 1995. Also, plaintiff points to a portion of the federal regulations under ADA, arguing that those require modification to make the entrance accessible before interior modifications are made, referring to 28

C.F.R. § 36.403. (Brady Test.) We have examined that regulation and it appears to be clearly inapposite because it only covers the situation in which the cost to provide an accessible path of travel is "disproportionate"; i.e., it exceeds 20% of the cost of the alteration to the primary function area. 28 C.F.R. §§ 36.403(f)-(g). In this case the cost of the ramp, rail and curb cut was obviously much less than the cost of renovating the

Defendant responded in its motion papers that plaintiff was not a prevailing party because plaintiff accomplished nothing more than that which was already planned before defendant was sued. Defendant contended that the owners intended when they acquired the property to complete renovations that would make the restaurant completely handicapped accessible, including the entrance and parking access. Given the cost and complexity of the entire renovation, defendant contended that it had taken time to complete the project properly. Defendant denied that the filing or the pendency of the lawsuit had any effect on the owners in making the improvements to the exterior. (Def.'s Main Br. at 2–5.)

We ordered the evidentiary hearing because these opposing contentions raised genuine credibility issues which we could not determine on the papers alone. *See Fowler v. New York State Board of Law Examiners*, 885 F.Supp. 66, 68 (W.D.N.Y. 1994) (the causation inquiry is primarily factual). As a result, we have had the opportunity to make a careful evaluation of the testimony of the witnesses and a thorough examination of the contemporaneous documentary evidence in order to determine the facts and circumstances.

■ It is our conclusion on the basis of the evidence that from the outset of acquiring Clinton House, the new owners planned and intended to render both the interior and exterior totally accessible and code-compliant, including the entrance and parking access. We further find that the filing, pendency and settlement of the lawsuit had absolutely no effect on either the design or the timing of the completion of the exterior improvements by those owners. *Cf. Dunn*, 842 F.2d 1420, 1435 ("[P]erhaps the district court may find some justification in the record for a conclusion that the plaintiffs conferred a significant benefit by getting the [defendant] to move faster, even if only incrementally.") Therefore, applying as we must the

most expansive interpretation of causation, we hold that plaintiff has not proven that this lawsuit was a catalyst for any arguable relief obtained. In other words, we find that the evidence does not support a finding, by a preponderance of the credible evidence, that this litigation constituted a material contributing factor in bringing about the installation of the ramp and the parking access at Clinton House, or the timing of the design and construction process for those improvements. *Metropolitan Pittsburgh Crusade*, 964 F.2d at 250. Accordingly, we hold that plaintiff has failed to establish the second prong of the prevailing party test and is not entitled to an award of attorneys' fees and costs. We will now explain our reasons for so holding.

Where, as here, the litigation did not result in a favorable judgment, the causation issue is whether "the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief," as for example where the defendants voluntarily change their behavior to eliminate the challenged conduct. *Baumgartner*, 21 F.3d at 546 (quoting *Wheeler*, 950 F.2d at 132). The test for causation, as thus stated, has both subjective and objective aspects. The objective inquiry asks whether defendant's behavior in fact did change during the course of the litigation. The subjective inquiry asks what the defendant's intentions were at the time the lawsuit was filed, and what effect, if any, the "pressure" of litigation had upon defendant's subsequent decision-making. We will address both aspects in the following review of the evidence.

The case was filed on July 1, 1996. At that time Clinton House had been under its current ownership for eight months, since October 30, 1995. The repair and reconstruction work was then in progress. The interior dining rooms, bar area and bathrooms had been renovated and made handicapped accessible during that initial

---

entire interior of the restaurant. Moreover, both of these arguments are misplaced for the

same reasons that we reject the companion arguments, discussed above in the text.

eight-month period. However, much work remained to be done, and the design and construction process was currently ongoing.

Mr. Gialias was the co-owner of Clinton House who worked as chef and business manager. The focus of the hearing was upon his decision-making process, because he made all of the business decisions concerning the renovation. Gialias testified that he was aware that there had been numerous complaints about the lack of handicap accessibility, from Ritter and others, dating back to the period when the Zierers owned it. He said he knew before buying the property that it had to be brought into compliance with all ADA and New Jersey Barrier–Free Code requirements, and that it was his intent from the date of purchase to thoroughly renovate the building, and in the process to bring it into total compliance. Specifically, he stated that he planned from the time they bought the building that it would have an entrance ramp.

It was the testimony of Gialias that he did not change his plans or his actions in any way as a result of this litigation. The scope of the whole renovation project was major. Gialias testified that the real estate purchase price was $575,000, and that the total cost of the repairs and renovations eventually came to approximately $400,000. In planning the reconstruction, Gialias relied upon advice from a person with substantial experience in restaurant design, Chris Stegemann. He also retained the services of architects, originally Lewis Salamone and later Susan Rochelle, to prepare the construction plans.

When Gialias testified at the hearing on May 20, 1999, he stated that the renovations were at that time recently completed, including the delivery and installation of the permanent galvanized steel rail for the ramp.[23] Gialias said that he received no complaints concerning the renovations from any handicapped persons during or upon completion of the work.[24]

Lewis Salamone testified extensively about the process by which the renovation was designed and carried out. He is a licenced New Jersey architect since 1968, presently in sole practice, who testified at the hearing without compensation. He was introduced to Clinton House by Chris Stegemann, for whom he had done architectural work on Stegemann's restaurant designs in the past. He understood that Clinton House had recently been purchased, and was asked to make a written proposal for the scope of his services. That proposal was accepted by Gialias in late 1995.

Salamone stated that he is well familiar with the accessibility requirements of ADA and related laws and regulations, and was aware of the need to comply with those laws in this project. He met with Gialias at the outset of the planning process. He testified that Gialias told him at that time that the restaurant was to be 90% redesigned. The renovation was to include a new entrance and hallways, new bar, new bathrooms, and redesign of all but one of

**23.** Here it will be recalled that Ritter last observed the premises during his trip from Florida in July, 1998, at which time the ramp was not yet installed, and that photos in evidence taken in January, 1999 showed the concrete ramp in place with a temporary wooden rail. Therefore, the total time from the date of acquisition (Oct.1995) to the date of construction completion (Spring 1999) was approximately 3.5 years.

**24.** Until the new entrance and ramp were completed, persons using wheelchairs were assisted into the restaurant by being pulled in their wheelchair up the one step onto the porch, and up the one additional step into the doorway. (*See* photos P–18 and P–22.) Restaurant staff were available for that purpose. The width of the existing entrance was sufficient for a wheelchair to enter. That had been the procedure long before Clinton House was acquired by the current owners. (Ritter Test.) There was inconclusive testimony during the evidentiary hearing as to whether that accommodation would meet the requirements of ADA, if performed exclusively by restaurant staff. Ritter testified that he was frequently assisted by non-staff, which he found objectionable. We need not resolve that issue to decide the pending motions.

the dining rooms—all to be barrier-free. It also involved the creation of a completely new kitchen in a different portion of the interior than the existing kitchen, and decisions as to how to use the space on the right front of the building where the old kitchen was located. During those initial discussions, according to Salamone, Gialias stated to him that the owners were going to spend a lot of money on renovating that historic building, and that they wanted the work, including the entrance ramp, to be beautiful and entirely functional and correct in every way.

Salamone explained that the permitting process for the renovations was accomplished in three phases, with three separate building permits: first the interior not including the kitchen; then the new kitchen; then the entrance ramp. He said that the obligation to file plans with the township Construction Official arose only at the time of applying for a building permit. His testimony demonstrated that before permits were applied for, the design work was in progress between the owners and architect. Salamone was involved in the plans for all three phases. He stated that he did the plans for the first two phases in detail, and that he did the original conceptual design work for the ramp. He said that the first phase was completed before the restaurant was opened for business in early 1996; that the second phase was completed in late 1997; and that he was involved in the project until that time. He testified that after 1997 his own work was concentrating in other areas, and Gialias engaged architect Susan Rochelle to make the detailed plans for the entrance ramp area.

The testimony of Mr. Salamone addressed the three design plans all dated in 1996 which were produced in discovery by Souders to Brady in October, 1996. (P–6 to –8.) He stated that the "Demolition Plan" dated January 22, 1996(P–6) was the first hard line drawing of the interior, indicating handicapped-accessible new bathrooms and halls. He said that a hard line drawing would be based on conceptual sketches made before that, which would be discarded. The other two of those design plans, both entitled "First Floor Plan," are dated August 27 and October 14, 1996. (P–7, –8.) Salamone stated that those plans show the first floor interior in detail, and also show his preliminary conceptual design for the entrance and ramp. He said that his intention, as instructed by Gialias, was to design the entrance and ramp to be ADA and code-compliant.[25] He also said that there was recognition of the need for handicapped parking reflected in those plans. He explained that the survey (P–17) showed that the area in front of Clinton House is publicly owned. Therefore, the designation of handicapped parking and the location of the curb cut had to be agreed between the owners and the town and preferably would relate to the location of the entrance.[26]

Mr. Salamone was asked to address the fact that the interior improvements were made before the design for the entrance and ramp was finalized, rather than making the entrance accessible at the same time that the interior public areas were renovated early in 1996. He testified that Gialias discussed with him the ramp design from "day one" of his engagement on the project, and that he, Salamone, was work-

---

**25.** It will be recalled that plaintiff's expert, Mr. Williams, when shown those 1996 floor plans, (P–7, –8), for the first time by defendant's counsel at the evidentiary hearing, testified that they represent an adequate removal of barriers at the front exterior of the building.

**26.** Mr. Williams, plaintiff's expert, also concurred in this description of the parking situation. He testified by referring to the survey that any changes to the curb of the sidewalk abutting the street in front of Clinton House, as well as parking space markings, would likely need to be approved by the town. Williams said that would be probably be accomplished only after the building plans for the entrance and ramp were made and approved by the town. Then another set of plans would be needed to show the roadway-related changes. (Williams Test.)

ing on the problem of the ramp from the beginning. He said that in his experience as an architect he would never design a compliant interior and not make the exterior compliant as well. He stated that the plans for the ramp which he prepared in 1996, and later in 1997, were not affected in any way by the filing or pendency of the lawsuit, nor was he ever asked to change any of his plans after the case was filed.

The problem with designing the ramp, according to Salamone's testimony, was twofold. First, Salamone said that he had been made aware by Gialias that there was concern among the town leaders, and the Construction Official, that due to the historic nature of the building (although not on the National Historic Register), the ramp design should not change the appearance of the exterior. Second, and related to that concern, the owners were considering two possible locations for the main entrance once the new kitchen construction was complete. The first location would be the existing main entrance, redesigned to be accessible. The other location under consideration was to place the main entrance farther to the right along the front of the building, where the door to the existing kitchen was located and where a new dining room was planned to replace that kitchen ("the alternate plan"). Salamone stated that he prepared drawings showing both alternatives, and that both were presented as concepts to the Construction Official, Mr. Leonard. He said that if Mr. Leonard had approved the alternate plan in concept, a permit application would have been submitted reflecting that design. Salamone stated that the objective of creating alternative plans was to attempt to accommodate the town's concerns while complying with all handicap accessibility requirements.

A letter dated March 20, 1997 from Salamone to Leonard discussed the alternate plan (P–30); and Salamone brought to the hearing his file copy of a drawing he prepared reflecting that alternative, dated June 9, 1997, which he stated he discussed with the town officials. (D–24.) Salamone's letter of March 20, 1997 reflected

that the progress in finalizing various aspects of the design work during 1997 was affected not just by the discussions about location of the main entrance, but also by the fact that there were other outstanding issues with the Construction Official, including a change of contractor, ongoing inspections of the construction work, and an issue with the masonry wall in the new kitchen under construction. (*Id.*) Salamone added that at one point the construction was halted by the Construction Official because of a problem with a stairway, and the stairway had to be removed.

Ultimately Salamone was informed by Gialias that in Gialias' discussions with the townspeople, in which he showed them both alternative designs for the entrance, they agreed that the main entrance should remain at its current location and that the ramp would be placed there. At no time, according to Salamone, was there any consideration of a ramp design which would have provided handicap accessibility through any entrance other than the main entrance. The only question was where the main entrance was to be located, and that was eventually resolved in favor of retaining the existing location. In the course of his testimony at the hearing Salamone reviewed the final design for the ramp, which was embodied in the Rochelle plan dated December 1, 1997 (D–7) and became the basis of the building permit for the ramp issued on March 16, 1998 (P–39). He also reviewed the photographs of the exterior taken in January, 1999 (P–18 to –23). He stated that the design as built was essentially similar to the original design for the main entrance that he had prepared in 1996, with certain additions including a new air-lock vestibule.

Chris Stegemann was named by defendant as a prospective fact witness for the evidentiary hearing and was deposed *de bene esse* by plaintiff due to illness. He stated that he was involved in designing the seating layout and interior decor of the Clinton House renovation from the time that it was first acquired, and he recommended Salamone to be the architect. He himself was not involved with designing

any ADA modifications and is not knowledgeable about those requirements. He testified that Salamone designed the construction plans and put handicapped accessibility into those plans from the outset. He said that Salamone's designs included a handicap entrance ramp "from day one," as ordered by Gialias, and that Salamone made various plans for the ramp. (Stegemann Dep. 1–26–99 at 9.) Stegemann was not involved with the project when Ms. Rochelle continued with the architectural work after Salamone was no longer active in it. (*Id.* at 7–16, 30–34.)

Gialias testified consistently with Salamone that the problem with designing the ramp was to meet the accessibility requirements while striving to win approval from the town, both in the legal sense and in the sense of community sentiment. He explained that there were considerations involving the Chamber of Commerce, the museum directly next door, town council members and long-time residents. Gialias himself was not a resident of the community. He also stated that he encountered many problems with the Planning Board with respect to the front exterior of Clinton House. He said that he and the Construction Official, Mr. Leonard, met at Clinton House at various times with the architects present, first Salamone and later Rochelle. He said he had at least a hundred discussions with Leonard in person and by phone, and that both the ramp and the .handicapped parking arrangements were a very big problem in his dealings with the officials. For example, he said that the alternate plan was developed in order to advance those discussions

during 1997. If the Construction Official had approved that plan in concept, it would have been constructed that way. Instead, the design process had to go through more revisions. He said that when the final design was ultimately approved and the permit was issued, the construction cost of the ramp was $7,000. The rail, which was custom-fabricated, cost $5,700. Gialias said that was approximately twenty times more than an ordinary rail would cost, but it is galvanized and has a special coating in the same off-white color as the building. Finally, Gialias testified that the other outcome of that lengthy negotiating process with the town was that he was able to obtain approval for two van-accessible spaces in the public parking area at the front. The January, 1999 photos indicate that a concrete sidewalk curb cut now makes those spaces accessible to the main entrance of Clinton House. (P–23.)

Gialias testified that from the beginning of the lawsuit his view was that Clinton House had done nothing wrong, and that he would not settle for the payment of any fees, because he felt that the suit was unfair. He indicated that his position throughout the case has been that no fees should be paid to plaintiff because the lawsuit did not cause him to change what he was already doing to bring Clinton House up to ADA compliance, or how he went about accomplishing that result. We agree.

We find that all of the credible evidence shows that there was an intention to make the property completely accessible, including the installation of a ramp, from the time that the property was acquired.[27] We

---

27. There was in fact no evidence that the owners did not intend all along to make the entrance accessible. At the hearing Ritter testified that he tried to make an appointment to speak with Gialias and spoke with him on the phone, whereupon Gialias was rude, refused to speak with him, and hung up on him. (Ritter Test.) At deposition, Ritter testified more fully about that conversation as follows:

Q. What specific communications did you have with the present owners regarding this access problem?

A. June 6, 1996, I called The Clinton House at 12:45 p.m. and spoke with Peter Gialias. I asked him about his access. And he said his architect is working on it. I asked him if he had gotten a permit to do the interior renovations. He said yes. When I asked him in a nice, non-threatening voice why he did not get a permit for making his entrance accessible, he became evasive and said he had to get back to work. I asked him if I could call him later, what would be a good time to call. He very rudely said,

further find that the owners wasted no time in commencing the design and construction work, which was expensive, complicated and extremely time-consuming. Whether or not they could or should have scheduled completion of the ramp and parking access phase at an earlier time in the process is not an issue that we must resolve in order to determine whether plaintiff was the prevailing party. The fact of the matter, as amply demonstrated in the record, is that the ramp and parking access were not completed any faster because of the filing and the pendency of the lawsuit. Indeed, even after the settlement of the lawsuit in January, 1998, that work was not fully permitted and completed until sometime between January and May of the following year, 1999. Nor did plaintiff have any input into the actual design of the resulting construction.[28] In short, we find no merit to any of plaintiff's arguments that his lawsuit caused anything to happen at Clinton House any differently or any sooner than it did occur.[29] For these reasons we find that plaintiff has not met his burden to establish causation in this case, and we therefore hold that he has not established prevailing party status so as to obtain an award of attorneys' fees pursuant to law.

■ We further hold, assuming *arguendo* that these facts would support a finding of some minimal degree of causation, that based upon our evaluation of the totality of the circumstances we would decline to exercise the judicial discretion conferred by the ADA and 42 U.S.C. § 1988. Attorney Souders certified that on at least one occasion Brady stated to him that this case would be utilized by Brady as a mechanism to collect attorneys' fees from Souders's clients, even as Brady was being requested to dismiss the case to avoid needless expense when the relief he was seeking was being voluntarily undertaken by them. (Souders Aff. 3–23–98 ¶¶ 16, 17.) Brady denies ever making such a statement. (Brady Test.) We find Souders's allegation in this respect entirely credible, based upon our assessment of Brady's demeanor as a witness and as corroborated by the objective evidence of the dilatory,

"Don't call me today. I have other things to do." And he hung up on me.

Q. What other conversations or communications did you have with the present owners other than the one that you just explained?

A. Every time I went in and he was visible, I would mention something about the access.

(Ritter Dep. 5–27–97 at 23–24.)

Q. Sir, notwithstanding the fact that Mr. Gialias allegedly indicated that they had no plans to fix the front entrance, he did indicate to you, as you testified to previously, that— and this was on or about June 6, 1996—that the architect was working on it—"it," meaning the access to the front of The Clinton House. Is that correct?

A. Yes.

(*Id.* at 64.) Gialias testified at the hearing that in approximately March, 1996, he escorted Ritter through the restaurant and showed him the renovations in progress, including the accessible halls and bathrooms. He testified that in response to Ritter's question as to when the entrance would be made accessible, he explained to Ritter that they were working on the ramp, but were in discussions with various people including the Construction Official about the design of the ramp and the

exterior appearance of the renovation. (Gialias Test.)

28. We have reviewed the expert report of Mr. Williams dated August 15, 1997. (Pl.'s Main Br., Attachment 10.) We find that it does nothing more than refer to the ADA requirements for ramps and accessible parking applicable to the property, and recommend that needed changes be made. Those requirements were already known to defendant's architects.

29. Our holding on the causation issue might be different if plaintiff had accepted either of the two earlier offers made by counsel for defendant which suggested full compliance within 30 or 60 days (P–9, –10), or if the owners of Clinton House had agreed to provide a temporary ramp. As we know, none of those events occurred. There were differing views expressed in the testimony as to whether early compliance by means of a temporary ramp was feasible, either legally or practically. But we need not resolve that dispute because clearly no such ramp was ever installed, so plaintiff cannot claim to have prevailed by causing defendant to provide a temporary ramp.

abusive and downright devious tactics employed by Brady in this case. In another context, the Court of Appeals for the Eighth Circuit has observed that "a nuisance settlement ... represents just such a special circumstance [warranting discretionary denial of attorneys' fees]. Suits that are frivolous or groundless are true nuisances; indeed, they are sometimes thinly disguised forms of extortion, the kinds of activities that courts ought, for obvious reasons, not to encourage." *Tyler v. Corner Constr. Corp.*, 167 F.3d 1202, 1206 (8th Cir.1999). Accordingly, we also deny the motion on the ground that the discretion of this Court will not be exercised to grant an award of attorneys' fees upon this record.

## B. *Defendant's Motion for Attorneys' Fees under Rule 11*

Defendant's motion filed in March, 1998 sought a total of $5,257.00 in attorneys' fees and costs for alleged violations of Fed.R.Civ.P. 11 and Local Civ. R. 11.3 and 54.2. (Souders Aff. 3–23–98 ¶¶ 32, 33.) At the conclusion of the hearing proceedings the amount requested had reached a total of $11,963.70. (Souders Certif. 5–25–99 ¶ 4.)

▮ Rule 11 provides that if a party or attorney makes a written representation in a paper filed with the court which violates the requirements of the Rule, the court may impose sanctions including payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result. Fed.R.Civ.P. 11(c).[30] Rule 11 is not the only means available to a court to correct and sanction inappropriate litigation conduct. *See, e.g.,* Fed.R.Civ.P. 26 through 37 (pertaining to discovery); and 28 U.S.C. § 1927 (allowing award of attorneys' fees for unreasonably and vexatiously multiplying the proceedings). In addition, a court possesses inherent power to impose sanctions in the just administration of the business of the courts. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). As our Court of Appeals has recently reiterated, "[s]anctions ideally operate as instructional tools to deter parties and attorneys whose conduct has not met the requisite professional standards from continuing on their wayward course of conduct." *Prosser v. Prosser*, 186 F.3d 403, 406–07 (3d Cir.1999).

▮ A court considering the imposition of Rule 11 sanctions must bear in mind that such sanctions are to be imposed only in exceptional circumstances, "where the claim or motion is patently unmeritorious or frivolous." *Dura Sys., Inc. v. Rothbury Invs., Ltd.*, 886 F.2d 551, 556 (3d Cir.1989). Sanctions are imposed, however, for pleadings not well grounded in fact and law after reasonable inquiry. *See Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc.*, 999 F.2d 745, 751 (3d Cir. 1993). The legal standard for alleged violations of Rule 11 is "reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir.1991) (citing *Business Guides,*

---

**30.** The substantive obligations imposed by Rule 11 are as follows:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, any attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, -

  (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

  (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

  (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery....

Fed.R.Civ.P. 11(b).

*Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 551, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991)). Reasonableness is defined as "an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact." *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1359 (3d Cir.1990) (quoting *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d Cir.1985)). "The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading ... was submitted." *Holtzman*, 775 F.2d at 540.

Defendant seeks to recover from Mr. Brady the attorneys' fees and expenses incurred for defending this action, contending that he violated Rule 11(b) because he filed a baseless, frivolous Complaint and failed to name the proper parties as defendants. (Def.'s Main Br. at 3–6.) Souders asserts that Brady failed to make reasonable inquiry before filing suit, both as to the identity of the owners/operators of Clinton House, and as to the merits of the underlying action. Had he done so, argues defendant, Brady would not have had reason to file the suit in the first place; would not have had to move to amend the pleadings to name the proper parties; and would not have subjected defendant to the protracted dispute over his application for counsel fees which followed the original dismissal of the case. (*Id.*) Souders further points out that there was never an admission of liability made by the named defendant or by any of his clients, and that he made repeated efforts to inform Brady that the lawsuit was unnecessary because his clients had promptly commenced the process of bringing the property into full ADA compliance when they became the owners. (Souders Aff. 3-23-98 ¶¶ 12–28.)

We agree with counsel for defendant that the conduct of Mr. Brady was unreasonable and unprofessional throughout his handling of this matter on behalf of plaintiff. He did not make any direct contact with the owners of Clinton House before instituting suit. The evidence is clear that if he had done so, he would have been informed of the actual status of the whole design and construction process, not just the part which had already gone to the Construction Official for permit approval. He would have learned, before filing suit, that the owners had already engaged an architect who was preparing plans which included full interior and exterior compliance with ADA. He also would have learned the names of both the deed owners and the business entity operating Clinton House, which at a minimum would have obviated the need to move for amendment of the pleadings at a later date.

We are firmly of the view that the filing of the Complaint under those circumstances was unreasonable and vexatious. However, we are unable to determine on the basis of the record before the Court whether the Complaint was frivolous within the meaning of Rule 11. That is because the parties did not brief or litigate the underlying merits of the claim either while the underlying dispute was in progress, or in connection with the cross-motions for attorneys' fees. We cannot say, without going beyond the present factual record and the briefs presented by the parties, whether the actual facts as they existed on July 1, 1996 would have supported a colorable claim under the ADA or the cited New Jersey laws.[31] Nor do we

---

**31.** The evidentiary record does establish that the portion of the Complaint alleging that the bathrooms and telephones were non-compliant was frivolous at the time the Complaint was filed, and we so hold. However, no attorney time was expended in defending that allegation, separate from the allegations with respect to the ramp and parking. Therefore, no sanction under Rule 11 can be ordered with respect to those moot allegations.

believe that the failure to name the proper parties, without more, can support the imposition of Rule 11 sanctions in these circumstances.

Given what this Court has discovered in the course of the present proceedings, which we consider to have been egregious conduct on the part of Mr. Brady toward his adversary and even his client, we have considered whether to impose sanctions *sua sponte* under 28 U.S.C. § 1927 or under the inherent power of the Court, of a monetary or nonmonetary nature, or both. *See, e.g.,* Fed.R.Civ.P. 11(c)(2). We will not do so, because due process would require notice and further proceedings. *See In re Tutu Wells Contamination Litig.,* 120 F.3d 368, 379 (3d Cir.1997)("The party against whom sanctions are being considered is entitled to notice of the legal rule on which the sanctions would be based, the reasons for the sanctions, and the form of the potential sanctions."); *Prosser,* 186 F.3d 403, 406–07 (same). In our view, the interests of judicial economy would not be served by further prolonging this case.

## IV. *CONCLUSION*

For the foregoing reasons we will deny the cross-motions for attorneys' fees and expenses, and will dismiss the action with prejudice. An appropriate Order accompanies this Memorandum Opinion.